[No. S045060. July 28, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
KEITH THOMAS LOKER, Defendant and Appellant.

694

COUNSEL

Lynn S. Coffin, Michael J. Hersek, State Public Defenders, under appointment by the Supreme Court, and Arnold Erickson, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens, Holley Hoffman and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CORRIGAN, J.**—Defendant Keith Thomas Loker was convicted of four counts of robbery, two counts of first degree murder, and one count each of attempted murder, assault with a deadly weapon, and second degree commercial burglary.[1] The jury also found true allegations of robbery-murder, burglary-murder, and multiple-murder as special circumstances, along with personal use of a firearm and infliction of great bodily injury.[2] It returned a judgment of death; we affirm.

---

[1] Penal Code sections 211, 187, subdivision (a), 189, 245, subdivision (a), 459, and 664. Further undesignated statutory references are to the Penal Code.

[2] Sections 190.2, subdivision (a)(3), (17), 12022.5, subdivision (a), and 12022.7.

## I. Factual Background

### A. *Guilt Phase*

#### 1. *Prosecution Evidence*

Defendant did not contest the facts of the crimes. His postarrest statements were consistent with the prosecution's evidence.

On November 23, 1991, at approximately 1:00 a.m., defendant entered an adult bookstore in Fontana. He was armed with a handgun and began firing rapidly. He shot customer Jose Lopez several times, but Lopez "played dead" and survived. A bullet struck Jennifer Widmer in the head, but did not penetrate her skull.[3] The cashier, Randall Paul, pulled Widmer to the floor. Defendant shot Paul five times. When Paul reached for a gun, defendant fired again. Paul died from his wounds. Defendant went to the back of the store and killed Richard Bodine by shooting him five times. He took the wallets of Lopez and Bodine.

At defendant's order, Widmer gave him the contents of the cash register. Other than when she had trouble turning off a radio, defendant was calm. He did not stumble, slur his speech, or otherwise appear intoxicated. Defendant asked Widmer to describe him. When she said he was 23 years old, he told her "16." Defendant told Widmer to wait 10 minutes and call 911. He said he would be watching and would kill her if she left. Defendant took some merchandise on his way out of the store.

Four days later, defendant was arrested in Arizona after a high-speed chase. He was driving a white Chevrolet pickup truck. The murder weapon and items taken from the bookstore were later found in a Toyota Camry in Arizona. The victims' wallets were recovered from a different Arizona location.

Defendant described the murders and robberies to the police. He had selected the store because of its isolated location. He had gone into the store earlier in the evening, but did not have his gun. When asked what "possessed" him to commit the crimes, he responded, "Strictly drinking, you know. It wasn't me." He had consumed three beers before his first visit to the store, and three more before returning. He had been drinking a six-pack a day for three months.

---

[3] The bullet was removed approximately one month later. At the time of the crimes, Jennifer's last name was James.

## 2. Defense

Defendant conceded responsibility and presented no evidence.[4] During closing argument, defense counsel contended his client was guilty of second degree murder or involuntary manslaughter, but not first degree murder, because he had acted on impulse without premeditation. He argued that the killings occurred during a commercial burglary, making them second degree murders, rather than during a robbery, which would elevate them to first degree murder. Counsel told the jury that if defendant's intoxication prevented him from forming the mental states required for robbery, burglary, or murder, he was guilty only of involuntary manslaughter. Counsel also claimed the jury could find that the robbery and burglary were incidental to the murders, and thus did not support the robbery and burglary special circumstances.

## B. Penalty Phase

### 1. Prosecution Evidence

The prosecution presented evidence of crimes committed by defendant before and after the bookstore offenses. The day before the murders, defendant robbed Frank Kim, an Arcadia store owner. Defendant put a gun to Kim's back, covered his mouth, and threatened to shoot him if he did not "shut up." He took Kim's keys, Toyota Camry, and cash.

After the bookstore crimes, defendant drove Kim's Camry to Arizona. On the evening after the killings, he left a note for his mother that said, "Pray for me. I am in a lot of trouble. I'll call later." The next day, he met with his cousin Tim Daulton and described the bookstore crimes. Daulton contacted the police.

The day after the murders, defendant robbed a convenience store in Flagstaff, Arizona. Julie H. was the cashier. Barry H., her husband, was in the back of the store. At gunpoint, defendant forced Julie to open the cash register. He removed approximately $300. Defendant was calm, steady of speech and gait, and did not smell of alcohol. When a customer entered the store, he had Julie hide until the customer left. Defendant took a handgun from under the register.

---

[4] Defense counsel's entire opening statement was: "Ladies and gentlemen. This is the finger that pulled the trigger that shot the people in the porno shop. And that's not what our case is about. Thank you."

He then went to the back of the store, where he encountered Barry H., forced him to kneel down, and shot him in the back of the head. Barry survived, but was legally blind for six months. His hearing was still impaired at the time of trial.

Defendant calmly told Julie, "You'll go with me or you'll die here," calling her "bitch." He handcuffed her with plastic ties and put her in Kim's stolen car. Julie begged for her life, telling defendant she had three young children who needed their parents, and assuring him she would not tell anyone. Defendant said that if she did not keep quiet he would shoot her. He drove to a remote location, blindfolded Julie, and walked her to the back of the car. He undressed her, threatened to shoot her, then raped her.

Defendant dressed Julie, put her back in the car, and started driving. At some point, the blindfold came off. When a police car passed in the opposite direction, defendant said, "They're onto me." Julie began talking about her children again, and started to pray. Defendant said, "I can't let you go because you can identify me now," and admitted shooting her husband. When Julie said defendant had ruined his whole life, defendant responded that the world was going to end in eight years anyway.

They passed more police cars going in the opposite direction. Ultimately, defendant pulled over and ordered Julie out of the car, saying, "I think there's going to be a shoot-out." After he drove away, Julie was rescued by passersby. She reported the Camry's license number to the police. Defendant abandoned the car at a gas station.

Three days later, one of defendant's cousins saw him driving a pickup truck and contacted the police. Defendant led a number of officers on a high-speed chase for about 40 minutes. At times he swerved at police cars, but did not hit any. He waved to news media filming the chase, which ended in a collision. Defendant told the police about the Kim robbery and the crimes against Julie and Barry H.

Julie visited defendant in jail, not "for him," but to ask him about HIV and to face her own fear. Defendant wrote Julie one or two letters of apology while incarcerated. On one envelope he wrote something like, "You have to have a few clouds in your life to enjoy the rainbows."

The parties stipulated that defendant pled guilty in Arizona to sexual intercourse while using or exhibiting a deadly or dangerous instrument, premeditated attempted murder, armed robbery, and five counts of aggravated assault.[5]

### 2. Defense Evidence

Defendant called 36 witnesses. Their testimony focused primarily on his upbringing in a religious cult, exposure to his parents' volatile relationship, rejection by his father, unrecognized emotional needs and hyperactivity, and remorse for his crimes.

Defendant was born in 1971 in Prescott, Arizona, and lived with his family in a trailer park. The park residents were members of the Branham Prophecy or Message Church, followers of Brother Branham, whom they believed to be a prophet. Defendant's mother was from the Daulton family; his father was a Loker. The two families constituted a significant portion of the approximately 120 residents of the park.[6]

Leo Mercer, a self-proclaimed minister, ran the park. After Brother Branham's death in 1965, Mercer gradually became more authoritative, employing various forms of punishment. He would ostracize people from the community and separate families. Children were beaten for minor infractions like talking during a march or not tying their shoes. Mercer would punish girls by cutting their hair, and force boys to wear girls' clothing. There was also evidence that Mercer sexually abused children.

Marietta Loker, defendant's mother, moved to the park in 1962 with her husband Jerry Johnson and sons Danny and Mark. Mercer did not like Jerry and set out to destroy the marriage. The next year Jerry divorced Marietta, and she eventually married Roger Loker, defendant's father. Mercer forced Danny and Mark to live with different families for about three years. Shortly before defendant's birth, the elder boys left the park to live with their father.

Roger Loker was perceived as homosexual by church members. He was beaten so that he would have marital relations with Marietta, leading to the conception of defendant and his older sister Hannah. When defendant was between 18 and 30 months old, Marietta would leave him at home alone for

---

[5] The stipulation entailed reading portions of the Arizona indictment to the jury. The indictment, which is not in the record, apparently did not include the name of each crime, i.e., forcible rape, but did include numerous elements. Because defendant's Arizona crimes are not at issue here, we have minimized the recitation of those elements.

[6] Defendant called numerous family members as witnesses. To avoid confusion, we will at times refer to the witnesses by their first names.

an hour at a time to run errands for Mercer. Defendant did not speak, except perhaps to say "mama," until he was three years old. Mercer ordered Marietta to whip and slap him because "he was being stubborn." She did so once for several hours, but could not bring herself to do it again. Other than this incident, there was no specific testimony that defendant was physically abused while in the park.

Education was not valued in the church, and many children dropped out of school. Boys were expected to marry and have children at age 18. Children were taught they would either go to heaven or burn forever. People outside the church were considered "atomic fodder" who would die, while believers would be saved. The park broke up at the end of 1974 or the beginning of 1975, when defendant was nearly four years old.

Defendant's mother was strict and physically abusive with defendant's half brothers Danny and Mark, but after she left the park she went "to the other extreme." Defendant had "no limitations." Danny did not believe his mother should have had children. She allowed defendant to do things for which Danny would have been severely punished.

When defendant was about four his father left the family, taking their motor home. The rest of the family moved in with defendant's grandmother. Defendant began bedwetting, a problem that continued into his early teens. His parents reconciled after 27 months and the family moved to Indiana, where they attended another Branham church.

When defendant was about 10, he and another boy were found fondling each other. Defendant was beaten by his father, who showed him little affection or attention and favored his sister Hannah. Defendant's father worked long hours and was away frequently.

Growing up, defendant had few friends, was overweight, and did not fit in at church. He was deemed not tough enough for the Daultons, and too wild for the Lokers. He felt worthless and disliked. Defendant was hyperactive but also, according to several witnesses, "happy-go-lucky." As he got older he suffered from extreme mood swings, sometimes associated with alcohol or diet.

Roger and Marietta had a volatile relationship. Marietta would scream and throw things; the two of them would slap each other until exhausted. Their children witnessed these confrontations, and the house was filled with tension. When defendant was in the third grade, Roger fired a gun after one fight; the children initially thought at least one parent had been shot. Roger divorced Marietta in 1989 when defendant was about 17, blaming defendant

for the breakup. He obtained a restraining order against his wife and son, and forced them to move from the house.

When defendant was approximately 13, he was involved in a Peeping Tom incident. He was interested in pornography and obsessed with violent movies, repeatedly watching one in particular. In the summer of 1991, defendant said he had a gun and was "going out for" a woman who had ended a relationship with him. He was arrested for drunk driving before he could carry out the assault. Defendant suffered no other criminal convictions before the California crimes.

Marietta testified that when defendant was in an early grade in Arizona, the school told her he was "emotionally handicapped." She did not seek help for this condition or for his hyperactivity. Defendant's standardized test scores in Indiana showed him to be a typical sixth grader. His sixth grade science teacher characterized him as an average student with poor reading and writing skills, who wanted a lot of attention. Defendant would kick or punch other students, and the teacher was afraid to leave him unattended in the room. In the eighth grade, he cruelly antagonized other students and had a high rate of absenteeism.

School representatives testified that defendant's parents were usually unresponsive to requests for meetings. According to Marietta, she visited the Indiana school several times. The teachers told her she was not strict enough with defendant, that he was not behaving and would not learn. She thought defendant was "very intelligent in some ways" but the teachers "just didn't know how to work with him."

Several teachers testified that defendant's academic and social problems were not addressed. Under current standards, he would have been identified as an at-risk student and given special help. On the other hand, his guidance counselor believed he did not lack capability but simply chose not to do well in school. His art teacher of several years never felt defendant needed testing or additional help. His seventh grade physical and driver's education teacher noted no emotional or psychological concerns, although defendant did have academic problems.

Defendant repeated seventh grade and failed the eighth. Ridiculed by his classmates when he repeated eighth grade, he dropped out of school sometime that year, when he was about 16 years old.

On the morning of November 24, 1991, before committing the Arizona crimes, defendant described the bookstore offenses to his cousin Tim Daulton. He was crying and remorseful, and said it was like being in a dream. He was also worried about Widmer, the surviving witness, because she could identify him.

The parties stipulated that after his arrest defendant expressed sorrow to his cellmate Randall Huddleston. He seemed most remorseful for raping Julie H., acknowledging that she would always suffer emotionally. Defendant never bragged about his crimes, and engaged Huddleston in long religious discussions.

Hannah testified that her brother's execution would "absolutely devastate" her.

## II. Discussion

### A. *Guilt Phase Issues*

#### 1. *Admission of Photographic Evidence*

Defendant contends the trial court erroneously admitted an autopsy photograph of murder victim Bodine that was irrelevant, unduly prejudicial, and served only to inflame the jury.[7] Taken before any incisions were made, the photograph shows the left side of Bodine's body from the head to just above the knees.[8]

■ Contrary to defendant's assertion, the photograph was relevant to the prosecution's case. The first degree murder charges were tried under the

[7] Defendant asserts the admission violated his state and federal rights to due process, a fair jury trial, and a reliable capital verdict. Thus, as to this, and almost every other appellate claim, defendant contends the alleged error infringed his constitutional rights. In those instances where he did not present constitutional theories below, it appears that either (1) the appellate claim is one that required no objection to preserve it, or (2) the new arguments are based on factual or legal standards no different from those the trial court was asked to apply, but raise the additional legal consequence of violating the Constitution. "To that extent, defendant's new constitutional arguments are not forfeited on appeal." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].) No separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or "gloss" raised for the first time here. (*Ibid.*)

[8] There was no objection when the prosecutor exhibited the Randall Paul autopsy photographs on a board during the coroner's testimony. Defendant claims, however, that the "trial court also admitted the autopsy photographs of victim Paul over objections that the photographs were cumulative and unduly prejudicial." He cites to a portion of the record at the end of the guilt phase where the trial court referred to all the autopsy photographs, said that defense counsel "had previously objected to at least two of those," and added that it assumed counsel would raise the same objections. Counsel said, "Yes." The court said, "Other than those two objections, [are there] any additional objections that you wish to be heard on regarding those photographs?" Counsel said, "No, your Honor." Defendant does not cite to, and we have not discovered, where in the record these objections were made. Nor does he identify the exhibits to which he now objects. We have, however, reviewed the Paul autopsy photographs, and see no error in their admission under the analysis applied above to the Bodine photograph.

theories of premeditation and felony murder. The photograph was pertinent because it showed the "nature and placement of the fatal wounds." (*People v. Pride* (1992) 3 Cal.4th 195, 243 [10 Cal.Rptr.2d 636, 833 P.2d 643].) It supported the prosecution's theory of how the murders were committed (*People v. Crittenden* (1994) 9 Cal.4th 83, 133 [36 Cal.Rptr.2d 474, 885 P.2d 887]), and illustrated the testimony of the coroner and percipient witnesses (*People v. Box* (2000) 23 Cal.4th 1153, 1199 [99 Cal.Rptr.2d 69, 5 P.3d 130]). The prosecution was not obligated to "accept antiseptic stipulations in lieu of photographic evidence." (*Pride*, at p. 243.) Defendant's reliance on *People v. Turner* (1984) 37 Cal.3d 302, 320–321 [208 Cal.Rptr. 196, 690 P.2d 669], which held that certain crime scene photographs admitted at trial were irrelevant, is misplaced. "*Turner* does not purport to create a broad rule rejecting or limiting the admissibility of crime scene photographs in all felony-murder cases. ▮ Rather, the usual principles of relevance . . . apply to such evidence." (*People v. Scheid* (1997) 16 Cal.4th 1, 18 [65 Cal.Rptr.2d 348, 939 P.2d 748].)

The photograph was not unduly prejudicial. While photographs of murder victims are always unpleasant, this one was not "so gruesome as to have impermissibly swayed the jury." (*People v. Smithey* (1999) 20 Cal.4th 936, 974 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) Moreover, when the trial court overruled his objection to the photograph, defense counsel asked for and received a cautionary instruction that the Bodine autopsy photographs were not intended to be "upsetting or inflammatory," but only to illustrate the coroner's testimony.

Defendant claims the photograph was particularly prejudicial at the penalty phase. However, evidence that illustrates the precise nature of the crime is admissible under section 190.3, factor (a). (*People v. Box, supra*, 23 Cal.4th at p. 1200.) Moreover, a photograph that was not unduly prejudicial at the guilt phase could not be so at the penalty phase, where the "trial court's discretion to exclude circumstances-of-the-crime evidence as unduly prejudicial is more circumscribed." (*Id.* at p. 1201.)

### 2. *Alleged Instructional Error*

Defendant contends the trial court committed several instructional errors. These claims are meritless.

#### a. *Flight Instruction*

The court gave the jury the standard language of CALJIC No. 2.52: "The flight of a person immediately after the commission of a crime or after he is accused of a crime is not sufficient in itself to establish his guilt, but is a fact

which, if proved, may be considered by you in the light of all the other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is . . . a matter for you the jury to determine." However, earlier the court had stated it would modify the final sentence of the instruction to say, "Whether or not evidence of flight shows a consciousness of guilt and the significance to be attached to such a circumstance are matters for your determination." Defendant did not object when the court failed to implement this modification, thus forfeiting his claims of error.[9] (*People v. Cole* (2004) 33 Cal.4th 1158, 1211 [17 Cal.Rptr.3d 532, 95 P.3d 811].) They are also meritless.

■ Defendant first argues that the unmodified instruction was impermissibly argumentative. However, we have held that this instruction "properly advise[s] the jury of inferences that c[an] rationally be drawn from the evidence." (*People v. Bacigalupo* (1991) 1 Cal.4th 103, 128 [2 Cal.Rptr.2d 335, 820 P.2d 559]; see also *People v. Mendoza* (2000) 24 Cal.4th 130, 180–181 [99 Cal.Rptr.2d 485, 6 P.3d 150].) Defendant next claims the instruction incorrectly required the jury to give at least some weight to the evidence of flight, creating a mandatory presumption. To the contrary, the jury was told only that the evidence "may be considered by you in the light of all the other proved facts."

Defendant also contends the instruction permitted the jury to draw impermissible inferences of guilt. We have rejected such arguments. (See, e.g., *People v. Mendoza, supra*, 24 Cal.4th at pp. 179–181; *People v. Smithey, supra*, 20 Cal.4th at p. 983.) Defendant asserts that his flight in Arizona did not necessarily show guilt about crimes in California, since he committed other serious crimes in Arizona. However, defendant left California shortly, in a stolen car, after the bookstore crimes. The jury could reasonably find that this departure, as well as the chase in Arizona, constituted flight from the California crimes. The fact that the chase may have occurred partly because of the Arizona crimes does not preclude the inference that defendant also fled to escape capture for his even more serious crimes in California. "Common sense . . . suggests that a guilty person does not lose the desire to avoid apprehension for offenses as grave as multiple murder[] after only a few" days. (*People v. Mason* (1991) 52 Cal.3d 909, 941 [277 Cal.Rptr. 166, 802 P.2d 950] [flight four weeks after murder].)

Defendant complains that the instruction allowed the jury to use the flight evidence to infer not only that he had killed the victims, but also that his state of mind was not affected by his use of alcohol or any other factor that would have lowered the degree of the homicides. "We have explained that the flight

---

[9] Defendant contends the instruction violated his rights under the Sixth, Eighth, and Fourteenth Amendments, and California Constitution, article I, sections 7 and 15 through 17.

instruction, as the jury would understand it, does not address the defendant's specific mental state at the time of the offenses, or his guilt of a particular crime, but advises of circumstances suggesting his consciousness that he has committed some wrongdoing." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1160 [63 Cal.Rptr.3d 297, 163 P.3d 4], italics omitted.) We have repeatedly rejected the claim that the flight instruction "permit[s] the jury to draw impermissible inferences about the defendant's mental state, or [is] otherwise inappropriate where mental state, not identity, is the principal disputed issue. [Citations.] As we have said, even where the defendant concedes some aspect of a criminal charge, the prosecution is entitled to bolster its case, which requires proof of the defendant's guilt beyond a reasonable doubt, by presenting evidence of the defendant's consciousness of guilt." (*Ibid.*)

### b. *Motive Instruction*

The jury was also given CALJIC 2.51: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence. You will therefore give its presence or absence, as the case may be, the weight to which you find it to be entitled."

Defendant argues that this instruction improperly allowed the jury to find guilt based on motive alone, reduced the prosecutor's burden of proof, and required defendant to show an absence of motive to establish his innocence, violating his rights to a fair jury trial, due process, and a reliable verdict in a capital case. We have rejected these challenges to the instruction. (*People v. Kelly* (2007) 42 Cal.4th 763, 792 [68 Cal.Rptr.3d 531, 171 P.3d 548]; *People v. Cleveland* (2004) 32 Cal.4th 704, 750 [11 Cal.Rptr.3d 236, 86 P.3d 302].)

### c. *Murder Instructions*

■ Defendant contends the trial court improperly failed to require the jury to unanimously determine whether its murder verdict was based on a theory of premeditation or felony murder. We have " 'repeatedly rejected this contention, holding that the jurors need not unanimously agree on a theory of first degree murder as either felony murder or murder with premeditation and deliberation. [Citations.]' (*People v. Nakahara* (2003) 30 Cal.4th 705, 712 [134 Cal.Rptr.2d 223, 68 P.3d 1190] (*Nakahara*).) Here, as in *Nakahara*, we 'are not persuaded otherwise by *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348]. There, the United States Supreme Court found a constitutional requirement that any *fact* that increases the maximum penalty for a crime, other than a prior conviction, must be formally charged, submitted to the fact finder, treated as a criminal element, and proved beyond

a reasonable doubt. [Citation.] We see nothing in *Apprendi* that would require a unanimous jury verdict as to the particular *theory* justifying a finding of first degree murder. [Citation.]' (*Nakahara, supra,* 30 Cal.4th at pp. 712–713.)" (*People v. Morgan* (2007) 42 Cal.4th 593, 617 [67 Cal.Rptr.3d 753, 170 P.3d 129].) Nor, contrary to defendant's contention, are felony murder and premeditated murder separate crimes. (*Ibid.*)

### B. *Penalty Phase Issues*

#### 1. *The Gaughan Report*

Defendant claims it was reversible error to allow the prosecutor to cross-examine defense witnesses about a psychiatric report, over his counsel's objections.[10] The six-page report was prepared by defense psychiatrist Thomas Gaughan in connection with defendant's Arizona crimes, and was included in the Arizona probation file. Dr. Gaughan recorded defendant's descriptions of an increasing level of criminal behavior, beginning in his early teens and culminating with the California and Arizona crimes.

As discussed below, the prosecutor originally intended to call Dr. Gaughan to relate the statements defendant made to him. However, the trial court delayed ruling on the permissible scope of Dr. Gaughan's testimony. After a number of defense witnesses had testified, the court decided that certain portions of the doctor's report, characterized by the prosecutor as "all the really good stuff," would be inadmissible if he were called to testify. The prosecutor ultimately decided not to call Dr. Gaughan, and his report was not admitted into evidence.

Nevertheless, many witnesses were cross-examined with reference to the Gaughan report. Some of the questioning was proper, and the court made efforts to minimize undue prejudice and to inform the jury of the limited relevance of the report. However, by delaying its ruling on specific parts of the report, and also by directing the prosecutor to cross-examine the witnesses about its contents only in general terms, the court permitted an approach that drew the jury's attention to aspects of defendant's personal history that were never testified to. This inevitably invited the jury to speculate about matters that were not in evidence, although under the circumstances of this case, we conclude the impropriety was not prejudicial.

Often, when rebutting evidence of good character, a prosecutor will ask witnesses if they have heard about particular incidents involving the defendant. Here, however, over defendant's objections, the prosecutor used the

---

[10] Defendant asserts the cross-examination violated his rights under the Fifth, Eighth, and Fourteenth Amendments to the federal Constitution, article I, sections 7 and 15 of the California Constitution, and Evidence Code sections 352 and 1101.

report in a different manner. When witnesses testified favorably about defendant's character, or when they testified about his emotional or behavioral problems, the prosecutor would ask them to read the report, and then inquire whether they were aware of the incidents described there.

■ When a defendant places his character at issue during the penalty phase, the prosecution is entitled to respond with character evidence of its own. "The theory for permitting such rebuttal evidence and argument is not that it proves a statutory aggravating factor, but that it *undermines* defendant's claim that his *good* character weighs in favor of mercy." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 791 [230 Cal.Rptr. 667, 726 P.2d 113] (*Rodriguez*).) Once the defendant's "general character [is] in issue, the prosecutor [is] entitled to rebut with evidence or argument suggesting a more balanced picture of his personality." (*Ibid.*) The prosecution need only have a good faith belief that the conduct or incidents about which it inquires actually took place. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1170–1171 [74 Cal.Rptr.2d 121, 954 P.2d 384]; see also *People v. Ramos* (1997) 15 Cal.4th 1133, 1173 [64 Cal.Rptr.2d 892, 938 P.2d 950]; *People v. Clair* (1992) 2 Cal.4th 629, 684–685 [7 Cal.Rptr.2d 564, 828 P.2d 705].)

The scope of proper rebuttal is determined by the breadth and generality of the direct evidence. If the testimony is "not limited to any singular incident, personality trait, or aspect of [the defendant's] background," but "paint[s] an overall picture of an honest, intelligent, well-behaved, and sociable person incompatible with a violent or antisocial character," rebuttal evidence of similarly broad scope is warranted. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1072 [5 Cal.Rptr.2d 230, 824 P.2d 1277]; see also *In re Ross* (1995) 10 Cal.4th 184, 207–208 [40 Cal.Rptr.2d 544, 892 P.2d 1287]; *People v. Clark* (1993) 5 Cal.4th 950, 1027 [22 Cal.Rptr.2d 689, 857 P.2d 1099].)

On the other hand, we have firmly rejected the notion that "*any* evidence introduced by defendant of his 'good character' will open the door to *any and all* 'bad character' evidence the prosecution can dredge up. As in other cases, the scope of rebuttal must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf." (*Rodriguez, supra,* 42 Cal.3d at p. 792, fn. 24.) In particular, "[e]vidence that a defendant suffered abuse in childhood generally does not open the door to evidence of defendant's prior crimes or other misconduct." (*In re Lucas* (2004) 33 Cal.4th 682, 733 [16 Cal.Rptr.3d 331, 94 P.3d 477].) When a witness does "not testify generally to defendant's good character or to his general reputation for lawful behaviors, but instead testifie[s] only to a number of adverse circumstances that defendant experienced in his early childhood," it is error to "permit[] the prosecution to go beyond these aspects of defendant's background and to introduce evidence of

a course of misconduct that defendant had engaged in throughout his teenage years that did not relate to the mitigating evidence presented on direct examination." (*People v. Ramirez* (1990) 50 Cal.3d 1158, 1193 [270 Cal.Rptr. 286, 791 P.2d 965]; see also *In re Jackson* (1992) 3 Cal.4th 578, 613–614 [11 Cal.Rptr.2d 531, 835 P.2d 371], disapproved on another point by *In re Sassounian* (1995) 9 Cal.4th 535, 545, fn. 6 [37 Cal.Rptr.2d 446, 887 P.2d 527].)

■ Here, defendant contends the prosecutor improperly introduced vague suggestions about "bad things" the witnesses did not know about, instead of presenting them with specific instances described in the report that were relevant to incidents or opinions described by the witnesses. Defendant also claims the court erred by permitting the prosecutor to refer broadly to the incidents in the report no matter how limited and specific the testimony of the defense witnesses was, in violation of the *Rodriguez* rule prohibiting the introduction of "*any and all* 'bad character' evidence" on rebuttal. (*Rodriguez, supra,* 42 Cal.3d at p. 792, fn. 24.) These arguments have substantial merit. A number of defense witnesses were improperly cross-examined as to their knowledge of irrelevant incidents, and the prosecutor's references to the contents of the report were sometimes unduly suggestive. Nevertheless, after reviewing the prosecutor's use of the Gaughan report, and the court's related rulings and admonishments to the jury, we conclude the impropriety was not so egregious as to prejudice the outcome of the penalty phase.

### a. The Testimony and Related Proceedings

#### i. Marietta Loker

The prosecutor first asked to use the Gaughan report after the testimony of defendant's mother, Marietta Loker. Defense counsel asked about a time when defendant "was shooting at bottles." Marietta explained that this happened in the backyard during her divorce from defendant's father. Defendant told her, "If I don't do this I'm liable to shoot my dad." Marietta also said that defendant had "totally changed" when he came back from a visit to Tulsa a few months before the California murders. In Tulsa, defendant could not "meet the Daulton image" of being "rough and tough" and ready to "fight in a minute." A couple of months before the murders, he was drinking six to 12 cans of beer a night. He "totally changed when he drank," becoming irritable and depressed.

At a bench conference, the prosecutor sought permission to counter the testimony that defendant became a "totally changed person" shortly before the crimes with defendant's statements in the Gaughan report, which described a pattern of criminal behavior and ideation that began much earlier. It

was agreed that the issue would be addressed later. On redirect, defense counsel asked Marietta if "as a teenager [defendant] would . . . get involved in bad things or violence." She responded, "That's the reason why I was so shocked when this happened, because [defendant] was kind of—he was tender; his sister could kind of beat him up." Defense counsel then asked a series of questions establishing that "things went downhill" after the Lokers' divorce when defendant was 17. Defendant became violent and talked about killing. However, even before then he had chronic emotional problems.

At a hearing out of the jury's presence, the prosecutor renewed his argument. He noted Marietta's testimony that defendant was "tender," and asked to use the Gaughan report to show that defendant's criminal behavior began when he was around 13 and escalated thereafter. The prosecutor asked the court how much detail he could go into, and whether he would be allowed to call Dr. Gaughan as a witness. Defense counsel argued that Marietta's testimony was consistent with the Gaughan report, because the serious incidents reflected in the report occurred after defendant was 17, and the most serious were within six months of the charged offenses.

The court decided that Marietta's testimony about defendant's tenderness and minor incidents of shooting at bottles had created an impression the prosecutor was entitled to counter with some of the material in the report. The court ruled that the prosecutor could not mention an incident in which defendant described shooting at someone in a vehicle. However, defendant's preoccupation with violence and pornography, his desire to be a criminal, and his stalking activity, were permissible areas of examination. The court told the prosecutor to ask about these matters "very generally," "without going into a lot of specific details." Defense counsel said, "I'll stipulate to that," and the prosecutor agreed. The court suggested that the better way to discuss specific incidents would be to put Dr. Gaughan himself on the stand.

On cross-examination, Marietta reaffirmed that she had been shocked about defendant's crimes, saying, "I never dreamed my son could ever be capable of doing what he did." The prosecutor asked her to read the Gaughan report, "without saying anything out loud to the jury." She was given time to read the report while another witness testified. Before her cross-examination resumed, another hearing was held out of the presence of the jury, at which it was established that Marietta knew only about a shoplifting incident and the Peeping Tom incident, and that the prosecutor would not question her on things she did not know about. He explained that he did not want to ask Marietta about things that would be painful to her, and the court agreed, noting that the incidents might come in later and "you could tie that together in argument, that there were these other things going on that she didn't know about."

Defense counsel made a continuing objection "to bringing in Dr. Gaughan's report in bits, pieces, or any other way." The court noted this broad objection, adding that counsel could raise further objections "in any particular instance or context." The court also opened up a further area for the prosecutor to explore. Because there was testimony that defendant's father had a reputation as a thief, the court said the prosecutor could ask Marietta if she was aware of the incidents of theft defendant had related to Dr. Gaughan.

In front of the jury, Marietta confirmed that she was aware of a window-peeking incident and a petty theft six months before the crimes in this case, but not any of the other material in the Gaughan report. She said, "I did not know that, the seriousness of all of that at all."

The cross-examination of Marietta was proper. Because defense counsel stipulated to presenting her with no specific instances of misconduct, defendant cannot now complain about that aspect of the cross-examination. Moreover, Marietta's portrayal of defendant as a tender child who changed dramatically shortly before committing his crimes permitted the prosecutor to bring up conflicting aspects of his character. The prosecutor did not characterize the contents of the report in his questioning; Marietta spontaneously mentioned "the seriousness of all of that." Defendant complains that her testimony about his father's reputation for stealing should not have opened the door to questions about his own shoplifting. However, defense counsel established that Roger Loker's skill as a thief became a family story that was passed along to defendant. In any event, the shoplifting incident was not emphasized, but merely presented as one part of defendant's history that Marietta knew about.

### ii. *Hannah Lunsford*

Defendant's sister Hannah testified at length about defendant's troubled childhood and adolescence. She described his problems in the trailer park, in church, in school, with the family, with friends, with girls, and with alcohol. On cross-examination, the prosecutor asked Hannah if she knew "all of the things that he was doing since early adolescence until the crimes that he committed in this case." Hannah said she did not. When asked specifically about other criminal activity, Hannah said she was "aware of other crimes." The prosecutor then asked if she had seen the Gaughan report.

Defense counsel requested a bench conference, at which he strongly objected to the prosecutor's use of the Gaughan report as "irrelevant, prejudicial, [and] beyond the scope." He complained that the questioning was "very suggestive," and not responsive to Hannah's testimony that defendant was an increasingly disturbed young man. The prosecutor responded that he

did not intend to identify specific incidents in the report, but only to question Hannah generally about what she knew, as he had done with Marietta. The court ruled that once defense counsel presented a particular portrait of defendant's personality or background, the prosecutor was entitled to bring out other aspects of his character. The court told the prosecutor he could ask about specific instances, but advised him to avoid general statements about "criminal activity." The court asked defense counsel if he would like an instruction telling the jury to disregard that reference by the prosecutor. Counsel accepted this offer.

The court told the jury, "there was a question asked where the witness made a statement something to the effect of I was aware of other, quote, criminal activity, end quote. You're directed to disregard that. If there is any specific instances of conduct, the attorneys will [be] talking about that—those specific instances. But when someone uses a broad general term such as criminal conduct or crimes or something of that nature, different people may mean different things. And it might well be very misleading. On the other hand, it may be very accurate. But rather than just talk about a general label, if there are any specific instances of specific conduct that are relevant to the testimony that's been given, the attorneys will discuss that specific conduct, and it will be up to you then to evaluate the conduct. So you are instructed to disregard the question and answer that related to other criminal activity. Not consider it for any purpose."

The prosecutor gave Hannah a copy of the Gaughan report to read during a break, asking her specifically to examine those pages where the doctor described the things defendant said he had done. The prosecutor said he would be asking her whether she was personally aware of any of those incidents. After the recess, before the jury returned, the prosecutor advised the court that Hannah knew about only a few things in the report, including an incident in which defendant felt rejected by a woman, the Peeping Tom incident, and his interest in pornography and violent movies. Defense counsel again objected, arguing that the prosecutor's line of questioning was unduly prejudicial and not probative under Evidence Code section 352, and an infringement on defendant's constitutional rights to an effective penalty phase defense.[11]

The prosecutor explained that he intended to call Dr. Gaughan to bring in the specifics of those parts of the report the court deemed admissible, but he was not going to be specific with Hannah, asking her only "which areas are you aware of." The court approved of this approach, noting it would be improper to question the witness about incidents she did not know about,

---

[11] Counsel invoked the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

although those might be brought in directly through Dr. Gaughan. Defense counsel argued that the court's original ruling was that if he elicited testimony that defendant was "just a fine angelic kid until the day before this incident, that of course in rebuttal to that, . . . other instances could come out." However, now the court was permitting the report to be used with every witness, whatever the nature of their testimony. The court responded that if the defense put on witnesses to testify to "various aspects of the defendant's character, . . . various things in his background," the prosecution was entitled to bring out "other aspects that have not been discussed by the witness," whether or not the witness was aware of them.

When Hannah returned, the prosecutor described the report as including "three types of areas." The court overruled defense counsel's objection that the prosecutor was "in effect testifying." The prosecutor identified the three areas as "certain incidents" in defendant's life from the time he was an adolescent, "certain fantasies he had," and "the kind of person he wanted to be." Hannah agreed with this "as far as I can tell." The court sustained an objection to a question whether Hannah was aware of the kind of person defendant wanted to be, telling the prosecutor not to go into specifics of which Hannah was unaware. The court sustained another objection to a general question whether Hannah was aware of defendant's fantasies. Asked about actual incidents she knew of, Hannah said she had heard about the Peeping Tom episode. The court sustained a hearsay objection, instructing Hannah to testify only about what she saw herself or heard from defendant. The only such matters were defendant's rejection by a woman, his interest in "women's magazines," and his enjoyment of violent movies.

The court erroneously overruled defense counsel's objections to the use of the Gaughan report during Hannah's cross-examination. Unlike Marietta, Hannah did not present a generally favorable picture of defendant's character. Her testimony about his troubled childhood did not open the door to evidence of defendant's criminal misconduct, fantasies, or aspirations. (*People v. Ramirez, supra,* 50 Cal.3d at p. 1193.) The fact that Hannah was unaware of some of the incidents in the Gaughan report did not contradict her testimony about the problems defendant had as a youth. Moreover, the prosecutor improperly characterized the contents of the report, rather than confining his questions to particular matters pertaining to Hannah's direct testimony. Although the court properly admonished the jury not to consider the prosecutor's description of the "criminal activity" in the report, the prosecutor's use of the report with this witness was overbroad and improperly suggestive.

### iii. *Robert Anthony Daulton*

Defendant's uncle Robert Anthony Daulton refused to answer questions about the Gaughan report. During a recess, the prosecutor proposed asking

Daulton if he knew about the incidents in the report. The court commented that Daulton had had only limited contact with defendant, and had said he was not aware of anything except the things he testified about. Daulton stated he would rather not read the report or know what was in it. The court told the prosecutor he could request, but not demand, that Daulton read the report. During cross-examination, the prosecutor brought up the report, and Daulton said, "I don't care to see it" because it "brings more shame to the kid." The prosecutor did not pursue the matter. The prosecutor's reference to the report in this instance was irrelevant, but brief, and the potential for undue prejudice was minimal.

### iv. *Shari Johnson*

Johnson, defendant's sister-in-law, testified that she was aware of defendant's "deep-seated problems." She mentioned his attraction to pornography, his mood swings, and his insecurities about finding a girlfriend. She had told Marietta that he needed counseling, but Marietta rejected the idea.

Defense counsel objected when the prosecutor said he wanted Johnson to look at the Gaughan report. While the jury was excused for a break, counsel argued again that the report was irrelevant and improper for use in rebuttal. He noted that Johnson's testimony about defendant's problems created "no distortion or inaccuracy." The court, however, ruled that the direct testimony regarding "various aspects of [defendant's] personality and character" allowed the prosecution to "inquire as to the extent of the witness's knowledge in those areas." The court stated that, as before, the prosecutor could ask if the witness was aware of the incidents described in the report, and she would "relate those" she was personally aware of, but not others, nor could the prosecutor explore those other areas. At defense counsel's request, the court told Johnson she did not have to read the report.

Johnson did read the report, and said she was not personally aware of any of the incidents. She had learned about some of them from family members. When the prosecutor asked about what she had learned, the court sustained a hearsay objection. The prosecutor asked if he could have Johnson indicate on the report which incidents she had heard about. The court said that could be done after she completed her testimony.

Again, the court erred by overruling defense counsel's objection. Counsel correctly noted that the report did not serve to rebut Johnson's testimony about defendant's problems. The court failed to perceive the distinction pointed out in *Rodriguez*: that *any* character evidence offered by the defense does not permit the prosecution to introduce *any* character evidence in rebuttal. "[T]he scope of rebuttal must be specific, and evidence presented or

argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf." (*Rodriguez, supra*, 42 Cal.3d at p. 792, fn. 24.)

v. *Tom Dillard*

Dillard was pastor of the church in Indiana that defendant and his family attended. He testified about the Lokers' troubled family life, but thought defendant was "basically like a normal hyperactive child." On cross-examination, the prosecutor referred to this statement and asked the following questions:

"Q. I assume that you don't know anything about what he may have been doing behind your back, correct?

"A. No, sir, very, very little.

"Q. And I take it the reverend or the pastor is the last guy you come to—

"A. Usually the last one to hear.

"Q. And I attempted to show Dr. Gaughan's report to you over the recess, correct?

"A. Yes.

"Q. And [defense counsel] wouldn't let me do that, correct?

"A. Right.

"Q. And that's fine because you wouldn't know the kinds of things [defendant] was doing through his teenage years if they were bad unless he told you or they were brought to your attention, right?

"A. Yes, sir.

"Q. Okay. So—so even if you read a report which included a lot of bad things, that'd be news to you, wouldn't it?

"A. It would be news to me, yes, sir.

"Q. So your opinions about [defendant] are based on some limited information, are they not?

"A. Yes, sir."

On redirect, defense counsel questioned Dillard further on defendant's problems with church and with his family. The prosecutor then asked: "Would you like to know what was going on in [defendant's] mind all the time he was growing up as a teenager and the kinds of things he was doing behind people's backs?" Dillard answered: "At this point in my life, no." The prosecutor said he understood, and asked no further questions.

While Dillard's testimony that defendant was a "normal hyperactive child" could properly have been rebutted with material from the Gaughan report contemporaneous with his observations of defendant, the prosecutor's references to the "bad things" in the report were improper. Defense counsel, however, did not object or ask for an admonishment to the jury.

### vi. *Elisabeth Jones*

Jones was defendant's cousin and called herself a "very good friend" of his. She testified about child abuse in the trailer park, and its effects on her. She also testified about defendant's personality, his feelings of worthlessness, and his problems with his parents.

The prosecutor asked Jones if she knew "what kind of things he may have been doing without the family's knowledge or the kind of person that he wanted to be without the family's knowledge." Jones said she thought defendant "wanted to be a good person." The prosecutor asked if she would "like to take a look at a report in which he made statements about what he was doing from early adolescence on, and the kind of person he wanted to be, and see whether or not he told you any of those things?" Defense counsel objected that the question was "inappropriate." The court sustained the objection. Jones agreed with the prosecutor that she did not know "what kind of things he may have been doing behind [her] back." The court sustained another objection when the prosecutor asked "if he were involved in some bad things, whether they were criminal or anything else, you wouldn't have any knowledge of that, would you?" In this instance, the court properly sustained counsel's objections.

### vii. *Hugh Scott*

Defendant's cousin Hugh Scott testified about growing up in the trailer park with defendant. He discussed the problems of the Daulton family and the abusive treatment of children in the park. He also spoke about defendant's insecurities and desire to have a family. Scott declined to read the report. On recross-examination, the prosecutor asked him whether defense counsel had

shown him the Gaughan report. Scott said no. The court sustained an objection when the prosecutor asked, "why do you suppose he hasn't shown you the report from Doctor Gaughan?" The prosecutor then asked if Scott would like to see it. Scott answered, "I'd rather not," explaining that he had "talked to a psychologist." The prosecutor said, "I'm not asking for evaluations, I'm asking would you like to see the things [defendant] told the psychologist about what he's been doing since he's been a teenager." Scott said, "I think I've heard just about as much as I want to hear." No error appears with regard to this witness.

### viii. *The Court's Ruling Limiting Use of the Report*

After Scott testified, the court took up the admissibility of the Gaughan report in detail. Defendant does not challenge the court's rulings on this occasion, but they are a central part of the relevant proceedings. The court noted that the defense had presented aspects of defendant's personality, character, and state of mind that opened the door to other such aspects "that might be inconsistent with or in addition to" the witnesses' testimony. The court said it would admonish the jury to consider the report only for assessing these character and mental state issues, and not for the truth of the matters stated or as evidence in aggravation.

Defense counsel renewed his objection to the use of the report in rebuttal, arguing that he had not put on psychiatric evidence, but merely evidence of defendant's troubled youth. Counsel contended the Gaughan report was improper rebuttal and unduly prejudicial. He said the report was intended to be confidential, had erroneously become part of the court file in Arizona, and provided a distorted picture of defendant based only on two interviews. He insisted that rebutting the testimony of family members with a psychiatric report was "simply not proper," and violated defendant's due process rights.

The prosecutor responded that the Gaughan report was relevant to show that defendant's problems stemmed not just from his family life and experiences in the trailer park and church, but also from that fact that "he was leading this secret life." The prosecutor intended to use only the statements defendant made to Dr. Gaughan, not the psychiatric aspects of the report.

The court reiterated its finding that in light of the defense witnesses' testimony, the report was admissible both to show the extent of those witnesses' knowledge of defendant and to "give a more complete picture by showing at least additional areas of his personality and character and intent that were not touched upon" in direct testimony. Dr. Gaughan's conclusions about defendant would not be admissible, unless the defense introduced its own psychiatric evidence.

The court then considered the various incidents defendant described to Dr. Gaughan. It ruled that the following incidents were admissible for purposes of rebuttal: defendant's "involve[ment] in window peeking"; his interest in pornography; his success with minor shoplifting and resulting feelings of control and self-esteem; his fantasies of a lifestyle as a successful outlaw; his attraction to movies with violent themes including sexual coercion; his fantasies about violent relationships with women and rapes; his plans for "more expensive burglaries" and initial steps he took toward them, which gave him a sense of power and a thrill;[12] his statement that success at thievery became one of the few things he was able to feel capable and proud about; his increased drinking and sexual compulsions; his stealing of trivial items to feel a sense of revenge and control over merchants he felt had wronged him; and an incident in which he had planned to rape a woman who refused to have a relationship with him.[13]

The court deemed the following statements in the report inadmissible as irrelevant or unduly prejudicial: defendant's feeling over the year before his arrest that he was "a master thief educated with information that he obtained through the movies"; a statement that he began to do things to see if he could get away with them; the increasing frequency of his thefts; his growing belief that he could lead the lifestyle of a master outlaw modeled after figures in the movies; an incident involving two prostitutes that did not develop as he had envisioned, after which he went looking for them with a loaded shotgun; an incident in which he shot at someone in a vehicle; detailed discussions of his mental state with regard to the charged offenses; and a statement that when he left Arizona he felt he had "crossed the line" and started hunting for a rape victim when he arrived in Los Angeles. The court also denied the prosecutor's request to confirm with Dr. Gaughan that the movie that influenced defendant the most was Henry: Portrait of a Serial Killer (Maljack Productions 1986).

### ix. Ted Schwartz

Ted Schwartz, defendant's art teacher in grades six through eight, gave generally positive testimony about him as a student. On cross-examination, the court sustained an objection when the prosecutor asked, "do you know anything at all about the kind of life he was leading behind your back?" Without specifically mentioning the Gaughan report, the prosecutor established that Schwartz would not know about "whatever he may have been doing outside of school, whatever bad things he may have been doing." Schwartz mentioned that defendant had told him about driving without a

---

[12] The court instructed the prosecutor to refer to "thefts" instead of "burglaries."

[13] Defendant explained that this plan was not carried out because he was arrested for drunk driving on his way to her apartment.

license. The prosecutor said, "I'm talking about other kinds of things which are far more serious. Did he ever tell you anything about things he was doing outside of school?" Schwartz answered, "no, he did not." Again, although the court correctly sustained a defense objection, the prosecutor's reference to the "bad things" defendant was "doing outside of school," which the jury would understand as a reference to the Gaughan report, was unduly suggestive and an improper cross-examination technique.

### x. *Pauline Borders*

Borders, who taught defendant in seventh grade, testified about defendant's academic difficulties and the school's failure to meet his needs. The prosecutor asked if she would "like to see a psychiatric report by Dr. Gaughan who talks about all the things [defendant] said he was doing while he was in school?" Borders said she would, and read the report during a break. When she returned, the prosecutor asked if she was "personally aware of any of the things that [defendant] reported doing from his early adolescence?" Borders said she was not. In the absence of an objection, the court had no occasion to rule on this use of the Gaughan report. However, the fact that Borders was unaware of anything in the report was clearly irrelevant to her testimony regarding his problems in school.

### xi. *Gershom Salisbury*

Salisbury was defendant's second cousin, and a good friend. He had grown up with defendant in the trailer park and later in Indiana. Salisbury testified about the difficulties defendant had with the Indiana church community. On a number of occasions defendant had discussed suicide, feeling worthless and disliked. Salisbury said defendant was "the last one . . . that I would have ever imagined I'd be sitting right here now" testifying for. Defendant was "just such a happy-go-lucky guy," although he was "kind of hyper." Salisbury said that looking back, he could see signs that he did not notice at the time, and now realized that defendant kept a lot of things bottled up inside. But "if you knew [defendant] very well, you just never would have dreamed there was ever anything like this." His "whole life was about . . . trying to please everybody and be accepted."

The prosecutor asked Salisbury, "if I were to show you a report from a psychiatrist to whom Keith said a bunch of things which may be inconsistent with your image of him, that would surprise you?" Salisbury said, "at this point, no." He explained that everyone has things they do not reveal, and that he knew defendant as well as anyone and that defendant "talked to me about everything." Defendant had told him about stealing tires from a car dealer not

long before the charged offenses, and they had a long conversation about that. However, that was the first time Salisbury learned about criminal behavior by defendant.

The prosecutor asked the court if he could show Salisbury the Gaughan report. Defense counsel requested that Salisbury be allowed to decline. The court ruled that he could be asked to read the report during the testimony of the next witness "to see if he's aware of any of the matters in there." Salisbury said his sister, who testified earlier, had told him some of what was in the report. He did not want to read the report unless defendant wanted him to. The prosecutor said he was certain defendant did not want it to be read, "but I want you to have the opportunity, since you've told us that his whole purpose in life was to please everyone and that he was just a happy-go-lucky good guy, I'd like you to see this other side of him and tell us whether or not you were aware of that other side of him." Salisbury responded that he was not aware of it. The prosecutor said he would still like Salisbury to read the report.

At this point, the court gave the following advisement to the jury: "Ladies and gentlemen, let me explain. There's been a couple of references to this report. And I don't know if you're going to hear any information about what was—what's actually in the report or not. If you don't, then obviously you cannot speculate as to the contents of the report or whether anything in the report is true or not true.

"Again, you're reminded that you must base your decision solely on the evidence that you do hear. And anything that—there has been a few things that have been mentioned during . . . cross-examination of some of the defense witnesses as to some specific instances of the defendant's back-ground, whether it's an incident with an ex-girlfriend or taking tires from someplace or anything of that nature, all of that kind of evidence is being admitted for a very limited purpose. It is not to show that the defendant has committed other bad acts and, therefore, he's a bad person. Or the death penalty is more appropriate because if—he stole some tires or he got mad at someone or anything of that nature.

"The only purpose of all of that testimony regarding any prior acts of the defendant is that many of the witnesses have testified to various aspects of the defendant's personality or his character or his state of mind at various times. And when a witness does that, that, so to speak, opens up the door for the other side to then say, well, there are other aspects of his personality or his character or his state of mind that we would also like you to be aware of.

"And the only purpose of it is so you can get as complete a picture as possible as to the personality and the character and the state of mind of the

individual. And all of that evidence is limited to that purpose, and you cannot consider it for any other purpose.

"For example, there was mention at the beginning of this phase of the trial and at the beginning of the trial, and you'll be instructed again at the end of the trial that one of the things you're going to be asked to do in this phase of the trial when you go out to deliberate is to weigh what we call aggravating circumstances against mitigating circumstances. And we'll be defining what those are for you. And we'll be giving you a list of . . . all the things that constitute aggravating factors, and we'll give you a list of some of the things that constitute mitigating factors.

"This kind of evidence about other things that the defendant may have done is not and cannot be considered by you as aggravating evidence. . . . [¶] . . . [N]one of that is a circumstance in aggravation and cannot be considered in that regard. [It] can only be considered as giving some light or balance to issues of personality, issues of character and issues of state of mind.

"And of course, if someone testifies to knowing a person and you say, well, there were other things I didn't know about, you can also consider that as far as the extent of their knowledge in giving you evidence about the person's character or personality or state of mind. All of that evidence is limited to that area and cannot be considered for any other purpose."

Salisbury asked if he had to read the report; the court said that he did. Defense counsel objected to having him read the portions the court had ruled inadmissible. The court overruled the objection. Subsequently, the parties stipulated that if called to testify, Salisbury would say that his opinions of defendant were based on his knowledge before the California crimes, and that he had not been aware of anything in the Gaughan report.

Salisbury's broad statements about defendant's good character could properly have been rebutted with similarly broad aspects of his bad character, based on specific incidents drawn from the Gaughan report. However, simply establishing that Salisbury did not know about the unspecified incidents that showed "this other side" of defendant's character did not provide the jury with any useful means of evaluating his testimony. Although the court's lengthy admonition was a valuable corrective measure, the problems it addressed could have been avoided by barring the prosecutor from making general statements about the nature and contents of the report, and requiring his cross-examination to focus on specific incidents relevant to Salisbury's testimony.

### xii. *Leland Loker*

Leland Loker was another second cousin who had known defendant all his life. He testified that defendant lacked self-confidence and was not accepted by some people in his family and church, but was "pretty much . . . happy-go-lucky." He dealt with rejection by pretending it never happened. Leland said that on one occasion, defendant was extremely upset when he ran over a cat on the way to work. He described defendant as neat and orderly, and said "he's always been a perfect gentleman."

On cross-examination, the prosecutor said he did not intend to cause Leland or any other family member pain, "but I have to ask you to take a look at these things to see whether or not it's a different Keith Loker than you know. Whether you're aware of that side of him." Defense counsel objected that the prosecutor was improperly characterizing the report. The court sustained the objection, and told the jury: "Again, ladies and gentlemen, you're reminded that the statements of counsel, including their questions, are not evidence . . . the only thing that you can consider as evidence is the actual testimony of witnesses. [¶] And as I indicated to you . . . if there are matters in this report that [the prosecutor] has referred to that are relevant, then I would assume that there will be some testimony from a witness about those areas. If there is not any testimony from a witness as to the statements [defendant] is alleged to have made in this report, then again you're instructed not to speculate as to what it was that might have been in there or why it wasn't presented to you. [¶] And not to consider it for any purpose except if witnesses indicate that they are aware of certain things or not aware of certain things. Then, of course, you can consider the witness' testimony in that regard as demonstrating either the extent or lack of extent of their knowledge of certain items."

The prosecutor requested a bench conference, and objected that the court had excluded portions of the report it deemed overly prejudicial, so he would be unable to present all the relevant matters to the jury. The court said, "[t]he problem is when the question directly states that here's a report that shows a very different side of the defendant, read it and tell me if you were aware of this side of the defendant, and then there's no evidence put on as to what was in the report, it clearly communicates to the jury that there's all this other evidence that shows a very different side of the defendant but we're not going to tell you what it is." The court advised the prosecutor to simply ask the witness to read the report and see whether he was familiar with the information in it, but not "to embellish and state as a fact that it shows a completely different side of the defendant."

The prosecutor also objected that the defense witnesses were testifying broadly about defendant's good character, and asked the court to reconsider

its ruling limiting the use of the report. Defense counsel responded that the witnesses were volunteering those statements, and his attempts to restrain them had been unsuccessful. The court said it would be willing to reconsider its ruling, but not as to this witness. It denied the prosecutor's request to modify the admonition it had just given the jury.

The prosecutor asked Leland to look at the Gaughan report and see if he was aware of any of the things defendant said in it. Leland said he would rather not, adding, "I'd just as soon remember [defendant] the way he was to me." The prosecutor said he would "respect that." Leland agreed that his opinions about defendant were based only on his personal observations.

The court's comments on this occasion demonstrate its awareness of the problems created by the prosecutor's repeated references to the Gaughan report. The court properly sustained defense counsel's objection and admonished the jury. Again, however, the impropriety of the prosecutor's general approach is clear. While Leland, like Salisbury, testified so generally about defendant's good character that a broad scope of rebuttal was permissible, vague statements from the prosecutor about "another side" of defendant were not helpful to the jury. Similarly, the fact that Leland or any other witness was unaware of unspecified incidents in the report was simply irrelevant to the jury's deliberations.

### xiii. *The Court's Ruling on Dr. Gaughan's Testimony*

After the defense witnesses completed their testimony, the prosecutor asked the court to reconsider its ruling on the Gaughan report. He had scheduled Dr. Gaughan to testify, but was concerned that the limitations the court had placed on the use of the report had so "watered down" the evidence that it might be preferable to not present it to the jury at all. He argued that the defense witnesses, particularly Gershom Salisbury, had testified so broadly regarding defendant's good character that all the matters in the Gaughan report should be admitted.

Defense counsel argued that Salisbury's statement of his personal feelings did not justify bringing in the matters in the Gaughan report, of which Salisbury was unaware. The court said it was not inclined to alter its ruling based on Salisbury's testimony. However, it noted that Leland Loker's testimony that defendant was upset over killing a cat, and another witness's testimony that he was upset when someone shot a dog, had placed in issue defendant's feelings on "issues of violence and taking human life." Nevertheless, the court was concerned the jury would be unable to confine Dr. Gaughan's testimony to considerations of character and mental state, without also improperly considering it as aggravating evidence of violent acts.

The court noted that Tim Daulton, another defense witness, had described defendant's statements about the charged offenses. It decided the prosecutor could respond by questioning Dr. Gaughan about defendant's statements discussing his mental state during the crimes. The court also ruled that defendant's reference to going to Los Angeles and hunting for a rape victim would be admissible. Otherwise, it adhered to its previous ruling.

The next day, the prosecutor informed the court that "all the really good stuff which would really balance the picture is not permitted. And therefore in balance, as a tactical decision, I've decided not to call Dr. Gaughan." Defendant, while he complains that the omission of the Gaughan report from evidence left the jury to speculate about its contents, does not raise any claim of error regarding the court's rulings limiting the scope of Dr. Gaughan's testimony.

#### b. *Prejudice*

As discussed above, the court erred in several ways in its handling of defense counsel's objections to the prosecutor's use of the Gaughan report. With certain witnesses whose testimony was limited to defendant's problems, and did not go to his good character, the court permitted the prosecutor to refer to "a course of misconduct that defendant had engaged in throughout his teenage years that did not relate to the mitigating evidence presented on direct examination," a practice we disapproved in *People v. Ramirez, supra*, 50 Cal.3d at page 1193. (See also *In re Lucas, supra*, 33 Cal.4th at p. 733.)

The court also allowed the prosecutor to refrain from asking about specific incidents in the Gaughan report that would be relevant to the witnesses' direct testimony, instead framing his questions in general terms that inevitably led to improper characterizations of evidence that never came before the jury, and created an unduly suggestive picture of the report that gave the jury no useful means of gauging the witnesses' credibility. This approach violated the fundamental rule that "the scope of rebuttal must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf." (*Rodriguez, supra*, 42 Cal.3d at p. 792, fn. 24.) Further, the prosecutor was permitted to repeatedly refer to a document that was not in evidence. No witness ever identified the report or laid a foundation for its admission. While the prosecutor could ask about particular incidents based on his good faith belief that the Gaughan report provided proof (*People v. Barnett, supra*, 17 Cal.4th at pp. 1170–1171), his questions purporting to identify the document and characterizing its contents were improper.

On the other hand, the court sustained a number of objections by defense counsel, and properly admonished the jury repeatedly and at length about the

limited role the Gaughan report could play in its deliberations. At the end of the penalty phase, the trial court gave a similar limiting instruction.[14] As is clear from our discussion of defendant's new trial claims (see pt. II.B.8.c., *post*), the jury heeded these admonitions and refrained from speculating about the Gaughan report during its deliberations. The prosecutor did not exacerbate the impropriety of his cross-examination during closing argument; he made no mention of the report. Two further considerations buttress our conclusion that the outcome of the penalty phase was not altered by the prosecutor's improper use of the report.

Defendant's penalty phase defense was founded on an attempt to explain how his upbringing in the authoritarian, abusive environment of the religious community to which his family belonged, and the violent, dysfunctional atmosphere of his family itself, had caused a level of psychological trauma that explained his criminal behavior. His emotional and social problems in the community, the family, and school were explored at length by defense counsel. The prosecutor's insinuations about the "bad things" in the Gaughan report did not tend to undercut the thrust of this evidence. Instead, they were consistent with the portrait of defendant as an abused, confused, emotionally disturbed youth.

Additionally, the jury had before it undisputed evidence of defendant's crime spree in two states, during which he killed two victims by shooting them at close range, wounded three others, kidnapped and raped a store clerk, and committed a string of robberies. Given the strength of this evidence, the nature of the penalty defense, and the court's repeated admonitions to the jury about its consideration of the Gaughan report, there is no reasonable possibility that the improper cross-examination affected the verdict. (*People v. Jones* (2003) 29 Cal.4th 1229, 1264, fn. 11 [131 Cal.Rptr.2d 468, 64 P.3d 762].)

---

[14] "Where on cross-examination a witness is asked if he or she has heard of or was aware of reports of certain conduct or statements of the defendant inconsistent with the traits of character, personality or state of mind to which the witness has testified, such questions and the witness' answers thereto may be considered by you only for the purpose of determining the weight to be given to the opinion of the witness or to their testimony as to the character, personality or state of mind of the defendant. Such questions and answers are not evidence that any such reports are true. And you must not assume from them that the defendant did in fact conduct himself inconsistently with such traits of character. [¶] Also, where on cross-examination a witness is asked if he or she was aware of certain conduct or statements of the defendant in a report, you must not speculate as to the contents of such a report unless there was actually evidence before you as to the contents of such report, nor may you speculate as to the reasons why any additional evidence as to the contents of such report was not presented to you."

## 2. *Limitation of Mitigating Evidence*

██ Defendant contends the trial court prevented him from presenting mitigating evidence regarding the consequences of his upbringing and family life.[15] The Eighth Amendment to the United States Constitution requires that a capital jury be permitted to consider " 'as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' (*Lockett v. Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 98 S.Ct. 2954], fn. & italics omitted.) Nonetheless, the trial court still ' "determines relevancy in the first instance and retains discretion to exclude evidence whose probative value is substantially outweighed by the probability that its admission will create substantial danger of confusing the issues or misleading the jury." ' " (*People v. Williams* (2006) 40 Cal.4th 287, 320 [52 Cal.Rptr.3d 268, 148 P.3d 47].)

Defendant claims the court erred in excluding testimony by a number of witnesses that would have shown his problems were directly related to his upbringing in a religious cult.

### a. *Deborah Chiba*

Deborah Chiba, defendant's aunt, was an emergency room nurse. She was allowed to testify extensively about her own and others' experiences growing up in the trailer park. When Chiba was six, she was called to the front of a prayer meeting, and asked to sit in Mercer's lap to tell him her sins. After she reported minor infractions, Mercer asked Chiba if she had ever improperly touched her private parts or those of her brothers. In particular, he inquired whether she had ever put her mouth on her brothers' genitalia or they on hers. She repeatedly denied this had happened.

Thereafter, Chiba was singled out for mistreatment, removed from her family, and placed in a different home. One day she was told she needed to be examined for worms. A nurse thoroughly examined her while Mercer watched. Her parents were not present. A few days later Chiba was brought to the dining hall, where Mercer announced to everyone that the nurse's examination had indicated Chiba was a "dirty little girl who liked to play with" herself. He called Chiba a whore and a lesbian.

In second grade, Chiba suddenly and falsely accused the school janitor of pulling her panties down when she was on the playground. She maintained

---

[15] He asserts the limitation violated his Sixth Amendment right to present a defense, Fifth and Fourteenth Amendment due process rights, and Eighth Amendment right to a reliable penalty trial, including presentation of relevant mitigating evidence.

that story, and it solidified in everyone's mind the idea that she really was a "nasty little girl." She made the accusation because she felt violated by the nurse's examination, and could not accuse the people she looked up to.

Chiba was sometimes whipped for minor infractions. Once her brother Johnny was beaten until he bled. In 1971, the year defendant was born, Chiba was about 10 years old. Mercer ordered that her hair be cut off to punish her because he had had a vision from God that she was being sexually inappropriate with young children. Chiba was beaten and forced to wear masculine clothes that covered much of her body, hiding her bruises. Her fingertips were burned so she would know what hell felt like. In 1973, Mercer moved Chiba to defendant's family. She stayed there until the park dissolved in 1975.

Chiba also testified about the animosity between the Daultons and Lokers, and the cult's emphasis on early marriage, derogation of education, and disdain for persons outside the church.

Defendant contends the trial court erroneously sustained two objections. First, defense counsel asked Chiba whether as she was growing up she noticed the effect of their religion, as her father taught it, on her sister Marietta. The trial court sustained the prosecutor's objection on Evidence Code section 352 and relevance grounds, and because it called for speculation. Chiba also testified that years later she had cared for Mercer as a student nurse when he was dying. Defense counsel asked, "Had he been, to your knowledge, abusing drugs?" The trial court sustained a relevance objection. Both rulings were proper. They did not prevent defendant from presenting evidence regarding life in the park and its effect on extended family members. To the contrary, Chiba's expansive testimony developed this aspect of defendant's case in great detail.

### b. *Danny Johnson*

Danny Johnson, defendant's half brother, related that he was physically abused by their mother while living in the park. He left the park before defendant was born. Danny did not really know defendant until defendant was about 16 or 17 years old, when they began working together. Danny had "a real problem with the park ever since [he] left," and had spent "about twenty-six years trying to forget as much as [he] could." He speculated that some family members opposed defense efforts to describe life in the park because it brought up events they had also been trying to forget, or for which they might face incarceration.

Defendant contends the court erred by not allowing Danny to testify about how "he was affected by his experiences in the trailer park." He did in fact

testify to this effect. The court excluded as irrelevant only testimony about Danny's experiences with persons other than his mother at the park before defendant was born. This limitation was well within its discretion.

Defendant also argues that the court improperly sustained a hearsay objection to Danny's testimony that one of defendant's cousins, David Daulton, had drawn a gun on a police officer and "if the police officer hadn't have known him and had to repeatedly tell him, 'Put the gun down,' he would have shot him." Danny learned of the incident from David Daulton. Defense counsel asserted without elaboration that the statement was against penal interest, and that even if it was hearsay, he was "simply offering it for the effect, the state of mind of my client and the effect of all of the family members on my client and what has happened to them."

The court properly ruled that the testimony was hearsay, as an out-of-court statement offered to prove the incident occurred. (Evid. Code, § 1200, subd. (a).) The court noted that if there was "evidence that the defendant was told of a particular incident, then of course that can come in, not for the truth of the matter asserted, but simply to show what he was told . . . for the purpose of showing what effect that information might have had on him." The court allowed Danny to testify that siblings of David Daulton had been in jail.

■ We need not decide whether the court should have admitted the testimony about the gun incident as a statement against David's penal interest. Hearsay testimony must meet an exception, but it must also be relevant. Counsel below claimed the purpose of the testimony was to show the effect of the incident on defendant's state of mind, but did not demonstrate that defendant knew of the incident. It was, therefore, irrelevant.

■ Defendant further contends the statement was admissible under *Green v. Georgia* (1979) 442 U.S. 95 [60 L.Ed.2d 738, 99 S.Ct. 2150], to show the effect of a common upbringing on defendant and his family. *Green* holds that "a defendant's due process rights are violated when hearsay testimony at the penalty phase of a capital trial is excluded, if both of the following conditions are present: (1) the excluded testimony is 'highly relevant to a critical issue in the punishment phase of the trial,' and (2) there are substantial reasons to assume the reliability of the evidence." (*People v. Kaurish* (1990) 52 Cal.3d 648, 704 [276 Cal.Rptr. 788, 802 P.2d 278], quoting *Green*, at p. 97.) Defendant did not rely on this theory of admissibility below, and the claim is therefore forfeited. (*People v. Smithey, supra*, 20 Cal.4th at p. 995.)

It is also meritless. Even assuming reliability, evidence that defendant's cousin had drawn a gun on a police officer was not highly relevant to a

critical issue in the penalty phase. In *Green*, the evidence was "highly probative of the defendant's innocence." (*People v. Smithey, supra*, 20 Cal.4th at p. 996; see *Green v. Georgia, supra*, 442 U.S. at p. 97.) Here, by contrast, the evidence was cumulative to other evidence that children from the park had committed crimes, and tangential because it had no bearing on *defendant's* character. Exclusion of such evidence does not deny a defendant due process of law. (*Smithey*, at p. 996.)

### c. *Mark Johnson*

Defendant's other half brother Mark Johnson lived in the park until he was eight years old. Like Danny, he left before defendant was born. Having been severely beaten several times by his uncle Jerry Daulton, he lived in constant fear of being brutalized. He did not meet defendant until defendant was 10 or 12 years old. He never saw defendant being abused.

Defendant contends the court erroneously sustained an objection to defense counsel's question whether Mark was negatively affected by his experience in the park. Counsel argued that the effect of the park on others was important because these people remained "close to" defendant, and since "the effects of the park affected them," they "therefore affected" defendant. The trial court properly ruled that no foundation had been laid that Mark was in the park at the same time as defendant, or that he had a relationship with defendant as they were growing up. The court stated it would allow testimony regarding "the specifics of how he related with [defendant] over . . . their experiences in the park."

Defendant claims this ruling prevented him from demonstrating that the park caused serious problems for his family members. However, that showing was made by the testimony of numerous other witnesses whose experiences were closer to defendant's than Mark's were. Moreover, the jury would reasonably infer that a child who was physically abused and lived in constant fear of being brutalized would have suffered from this experience.

### d. *Hugh Scott*

Defendant's cousin Hugh Scott testified that the Daulton men were very outgoing, financially successful, and sexually active. He heard many legends about Daulton men as he grew up. Defendant gave Hugh the impression he was influenced by these stories.

Defendant contends the court improperly barred Hugh's testimony about the effect of the Daulton legends on Hugh. The claim is meritless; the court

correctly deemed this testimony irrelevant. Hugh testified that he and defendant knew the stories and discussed them, and that defendant seemed to be affected by them. Contrary to defendant's assertion, the importance of the family legends was demonstrated by this testimony.

### e. *Doris Scott*

Doris Scott, defendant's aunt, moved to the park in 1962 when she was 18, and left in 1975. At the time of her testimony, she had recently learned that Mercer had molested one of her sons.

Hugh, her youngest son, was raised in the park and had trouble with violence as an adult. Doris turned her own anger inward, and tried to commit suicide twice. Unlike defendant's father, her husband loved her sons dearly and openly. She and her husband felt guilty for not protecting their children, and had spent the rest of their lives trying to make up for what they suffered at the park.

Doris testified that her own children had problems with violence, and at least one of her sons had problems with the law. Defense counsel pursued the matter, asking, "a lot of the kids coming out of that have had problems and continue to have problems?" Doris answered, "Yes, sir. My younger brothers and my younger sisters have all had problems." In response to a prosecution objection, the trial court ruled that "generalities that other people have had problems is fine, and that answer will remain. But going into the details of problems of others would be irrelevant." The ruling was proper. Moreover, as discussed above, the jury heard extensive testimony about the negative impacts of park life.

As to all these witnesses, defendant complains that the court's limitation of defense counsel's questioning prevented him from fully rebutting the prosecutor's assertions that he was the only member of his church or extended family who had problems or committed criminal acts as a result of his upbringing.[16] We disagree. "Although the Eighth and Fourteenth Amendments confer a right upon capital defendants to present all relevant mitigating evidence to the jury [citation], the United States Supreme Court never has suggested that this right precludes the state from applying ordinary rules of evidence to determine whether such evidence is admissible." (*People v. Smithey, supra,* 20 Cal.4th at p. 995.) We note that Danny Johnson, and Hugh and Doris Scott, all testified that children from the park later had

---

[16] Various witnesses testified in response to the prosecutor's inquiries that they were not aware of any other family members who had committed kidnapping, rape, attempted murder, or murder.

trouble with the law. The court did not deprive defendant of his right to present relevant mitigating evidence.

### 3. Failure to Issue a Protective Order

Defendant contends the court erroneously refused to issue a protective order, allowing the prosecutor to abuse discovery procedures by intimidating witnesses and limiting mitigating evidence.[17] These claims fail.

#### a. Background

At a pretrial hearing, defendant agreed to give the prosecution notes and tapes of interviews with numerous potential defense witnesses, under compulsion of the reciprocal discovery statutes and to assist in settlement negotiations. He sought a protective order on the ground that "this case involves a number of highly sensitive, highly embarrassing, very secret issues among" defendant's family, extended family, and close friends. Defense counsel had been told by his capital case coordinator that there were threats to kill or castrate counsel if he "harm[ed]" the family. The case coordinator also believed that defendant's grandfather was "in all likelihood having sexual relations with" defendant's mother. The parties agreed on a protective order temporarily precluding the prosecution from disclosing discovery information or contacting penalty phase witnesses.

At a subsequent pretrial hearing, the court stated that the "order about not disclosing that information to anyone and not doing any follow-up with that information would stay in effect at least through the guilt phase." However, the defense was free to permit investigation into particular areas before the penalty phase. Counsel agreed that a detective could review the discovery and speak to defendant's former teachers and principal. By recounting these unusual arrangements, we do not suggest that they were required.

Following the guilt phase, the prosecutor brought up the disclosure of witness statements and interviews. He observed there were approximately 45 defense witnesses, and only three weeks before they would testify. Defense counsel responded that a number of witnesses had expressed grave reservations about testifying. He was concerned that if the prosecutor confronted these witnesses with allegations of sexual and physical abuse, incest, and homosexuality, defense counsel's job would become more difficult "in terms of getting them here and getting them to testify." Therefore, while he

---

[17] He asserts violations of his due process rights under the Fifth and Fourteenth Amendments and the state Constitution, his Sixth Amendment right to trial by jury and compulsory process, and his Eighth Amendment right to a reliable penalty verdict in a capital case.

intended to elicit testimony in these areas, he requested that the court direct the prosecutor not to explore them during his investigation.

The court lifted the protective order, ruling that the prosecutor was entitled at this point to investigate the information. The court noted, "Obviously it would be improper for the prosecution to do anything that was designed to intimidate defense witnesses or . . . suggest to them that they better not show up in court." The court also suggested that the prosecutor assure the witnesses he was not seeking information to prosecute them for the acts in question, which occurred outside California.

Several days later, the parties revisited the subject. Defense counsel sought an order precluding the prosecutor from either sharing with family members the investigators' reports reflecting their impressions of the witnesses, or asking one witness about another witness's statement. In particular, defense counsel was concerned that the prosecutor would ask witnesses about the case coordinator's impression that on one visit she had interrupted an incestuous encounter between defendant's mother and grandfather. The trial court denied the request, except to the extent any investigator's impressions of a witness could be considered work product. "I don't see how you can tell the prosecution, well, yes, I am going to be presenting evidence along these lines in my case in mitigation but I want the prosecution precluded from investigating or inquiring into those areas. If you're going to be presenting the evidence they have a right to investigate it." The court also stated, "I really don't think it's in the realm of the court to try to supervise and delineate the specific rules of either side's investigation, other than to assure that nothing is done by either side that results in either intentional or unintentional intimidation of the other side's witnesses, which would, of course, be improper."

### b. *Analysis*

Defendant claims the court abused its discretion by failing to order the prosecutor not to show one defense witness the statement of another witness. Not so.

■ Under the discovery statute, the defense is required to disclose to the prosecution certain materials, including "any relevant written or recorded statements" of those it "intends to call as witnesses at trial." (§ 1054.3, subd. (a).) A defendant demonstrating good cause may seek to deny, restrict, or defer disclosure. (§ 1054.7.) " 'Good cause' is limited to threats or possible danger to the safety of a victim or witness, possible loss or destruction of evidence, or possible compromise of other investigations by law enforcement." (*Ibid.*) However, the trial court retains authority to regulate discovery to protect a defendant's constitutional rights. (*People v. Superior Court*

(*Mitchell*) (1993) 5 Cal.4th 1229, 1238 [23 Cal.Rptr.2d 403, 859 P.2d 102];
*Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 382 [285 Cal.Rptr. 231,
815 P.2d 304].)

Here, defendant contends a protective order was necessary to avoid the possible loss or destruction of evidence. (§ 1054.7.) However, he fails to explain how the prosecutor's legitimate questioning of defense witnesses about the very matters defendant intended to explore at trial would lead to the loss or destruction of evidence. Witnesses might be reluctant to discuss sensitive issues, or might deny they happened. However, such reluctance flows from the nature of the evidence itself and its public discussion, not from the trial court's refusal to issue a protective order.

Defendant further contends the prosecution improperly used the witness reports to dissuade witnesses from testifying. He points to no facts supporting this assertion. Indeed, he expressly refrains from asserting prosecutorial misconduct. Similarly, there is no factual support for defendant's claim that the failure to issue a protective order hindered his counsel's investigation and presentation of mitigating evidence, particularly the alleged incestuous relationship between his grandfather and mother. Only the investigator's suspicions suggested such a relationship, and defendant fails to show how the absence of a protective order prevented him from investigating it, whether it preceded the capital crimes, whether defendant knew of it, or how it might be relevant in any way to the defense.

### 4. *Exclusion of a Toxicology Report*

Defendant contends the court improperly excluded a toxicology report showing that murder victims Randall Paul and Richard Bodine had high levels of methamphetamine in their systems.[18] During an in limine hearing at the guilt phase, the prosecutor sought to exclude any reference to the report. Defense counsel argued that the evidence would be relevant primarily to his penalty phase arguments, though he also wanted to use it to impeach the testimony of the surviving shooting victim, Jennifer Widmer. On appeal, defendant's claim of error also goes principally to its asserted effect on the jury's penalty phase determination.

The court ruled that the methamphetamine levels found in the victims were generally irrelevant to any guilt or penalty phase issues, with one possible exception. The court observed that defense counsel was entitled to explore whether Widmer had been using drugs on the night of the crimes, and that if

---

[18] Defendant contends this limitation violated his rights to confrontation, due process, and a reliable death verdict under the Fifth, Eighth, and Fourteenth Amendments, and California Constitution, article I, sections 7 and 15.

she denied doing so the methamphetamine use by Paul, who was Widmer's friend, might be admissible for purposes of impeachment.

Widmer testified that she had been on her way home from a friend's house when she stopped at the store to visit Paul. She was only there for a few minutes before defendant arrived. She did not notice the plate containing a white powder that appeared in a crime scene photograph,[19] nor did she notice any indications that Paul was under the influence of drugs. Widmer also said she herself was not under the influence. When defense counsel began to pursue the issue of Paul's drug use, the court sustained the prosecutor's objections. After hearing argument outside the presence of the jury, the court ruled that Paul's methamphetamine level was not relevant impeachment evidence, in light of the nature of Widmer's testimony.

Defendant contends this evidence was admissible as a circumstance of the crime under section 190.3, factor (a), because methamphetamine use was listed on the autopsy report as an ancillary cause of death. Defendant is incorrect. The autopsy report notes methamphetamine abuse as a "diagnosis" but identifies "multiple gunshot wounds" as the sole cause of death.

Defendant also argues that the evidence of methamphetamine abuse was relevant to rebut the prosecution's attempts to diminish any suggestion of drug use by the victims. He fails to explain the relevance of the victims' drug use. It had no apparent impact on their behavior with respect to defendant's actions. Defendant suggests the evidence would have affected the credibility of both Widmer and Detective Duffy (see fn. 19, *ante*). However, it is not clear how the test results would have undermined Duffy's testimony that he did not know if the powder was "dope." As to Widmer's credibility, given her testimony that she arrived at the store only two or three minutes before defendant appeared, her opportunity to observe Paul using drugs was extremely limited. Therefore, the impeachment value of the toxicology report was negligible, at best.

 Finally, defendant contends the report was admissible to rebut victim impact evidence. The prosecution, however, presented no victim impact evidence. While the prosecutor did ask the jury during argument to remember

---

[19] In earlier testimony, Detective Duffy described the crime scene. The prosecutor asked him about a photograph showing a dish with bits of white powder sitting next to a pack of cigarettes, as well as the store phone and cash register. As to the powder, Detective Duffy testified, "I wouldn't know what that is." The prosecutor asked, "Do you know whether or not that's dope?" "No, I do not." "Okay. If you had suspected it was dope at the time would you have collected it and had it analyzed?" "Definitely." The prosecutor subsequently asked, "So you don't know . . . whether this is dope or not, correct?" "No sir, I do not." There was no other evidence establishing what the dish contained.

the victims and their families in its penalty deliberations, this did not give defendant the right to present evidence that the victims had been using drugs when they were murdered. " 'The court is not required to admit evidence that merely makes the victim of a crime look bad.' (*People v. Kelly* (1992) 1 Cal.4th 495, 523 [3 Cal.Rptr.2d 677, 822 P.2d 385].) Thus, the trial court did not abuse its broad discretion in concluding that the evidence lacked probative value . . . ." (*People v. Stitely* (2005) 35 Cal.4th 514, 548 [26 Cal.Rptr.3d 1, 108 P.3d 182].)

### 5. *Admission of Evidence Regarding Arizona Plea Negotiations*

Defendant contends Julie H. was improperly allowed to testify that she opposed defendant's offer to plead guilty to all the Arizona charges except sexual assault.[20]

During cross-examination, defense counsel asked Julie, "It's my understanding from speaking with you previously . . . that the eighty-four years [defendant] received in Arizona was sufficient for you; is that correct?" Julie replied, "It is sufficient for my case."

On redirect, the prosecutor asked Julie if she was aware that under Arizona law, defendant would serve 66 years of the 84-year sentence. She said, "Yes, I am." The prosecutor subsequently asked whether Julie was told what defendant was trying to accomplish during the Arizona plea negotiations. She said, "Yes. . . . I was told that he would strongly consider any plea agreement that took off the sexual assault charge." The prosecutor inquired, "And what did you say about that?" Julie replied, "Absolutely not." Defendant objected that the testimony was hearsay and irrelevant.

The trial court ruled the testimony was admissible to show Julie's "state of mind to help explain the answer that was elicited on cross-examination." The court instructed the jury that the testimony was admitted for that limited purpose, and not to prove the conversations actually occurred. A stipulation specifying the Arizona crimes to which defendant pled guilty, including sexual assault, was subsequently read to the jury.

 Defendant argues that Julie's testimony regarding the plea negotiations was irrelevant because it did not relate to any aggravating factor or disputed material fact. Defendant, however, opened the door to this evidence by asking Julie if she was satisfied with the term defendant received for his crimes. " 'It is settled that the trial court is given wide discretion in

---

[20] Defendant claims the admission of this testimony violated his federal and state constitutional rights to due process, his Eighth Amendment right to a reliable penalty determination, and Evidence Code section 1153.

controlling the scope of relevant cross-examination.' (*People v. Farnam* (2002) 28 Cal.4th 107, 187 [121 Cal.Rptr.2d 106, 47 P.3d 988].)" (*People v. Lancaster* (2007) 41 Cal.4th 50, 102 [58 Cal.Rptr.3d 608, 158 P.3d 157].)

Defendant further contends that admitting evidence of the plea negotiations violated Evidence Code section 1153, which provides in relevant part: "Evidence of a plea of guilty, later withdrawn, or of an offer to plead guilty to the crime charged or to any other crime, made by the defendant in a criminal action is inadmissible in any action or in any proceeding of any nature . . . ."

Defendant did not object on this ground below, and the claim is therefore forfeited. (*People v. Sirhan* (1972) 7 Cal.3d 710, 745 [102 Cal.Rptr. 385, 497 P.2d 1121], overruled on another point by *Hawkins v. Superior Court* (1978) 22 Cal.3d 584, 593, fn. 7 [150 Cal.Rptr. 435, 586 P.2d 916].) Further, it was defense counsel who first introduced evidence of the plea agreement. In any event, assuming that Julie's testimony on this topic was statutorily inadmissible, the error was clearly harmless under any standard. Defendant claims the testimony might have led the jury to speculate that he was trying to evade responsibility for his Arizona crimes or that he was not truly remorseful. However, such a conclusion on the jury's part was unlikely, given defendant's plea of guilty to sexual assault and numerous other charges, Julie's testimony that he had apologized to her both in person and in writing, and his profession of remorse to his cellmate.

### 6. *Prosecutorial Misconduct Claims*

#### a. *Alleged Improper Cross-examination*

Defendant claims the prosecutor committed misconduct by asking a defense witness about a psychological study and by cross-examining the witness as an expert.[21] We disagree.

On direct examination, Malcolm Stauffer, defendant's former guidance counselor, testified that he had training in clinical and educational psychology. Defense counsel asked, "As a professional guidance counselor with the education and training that you have had and described to us, what was it, then, that you did or identified or thought about in terms of [defendant]?" Stauffer discussed the impression he got from defendant's parents that defendant was simply not interested in school, had other interests that were more important to him, and had decided he did not need to go to school because he had a job drywalling. At the time, Stauffer thought defendant

---

[21] As to all his prosecutorial misconduct claims, defendant contends the misconduct violated his right to due process, confrontation, and a reliable verdict. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15.)

simply chose not to do well in school, not that he lacked the capability to do well. He did not know defendant had been in classes for the emotionally handicapped in Arizona. An emotionally handicapped designation in Stauffer's school was only reached after significant testing, input from parents and teachers, and the evaluation and recommendation of a school psychologist.

Stauffer did not recall that defendant would "antagonize people for attention." Defense counsel asked if Stauffer was aware "that in many instances" defendant "would become quite hyper." Stauffer said he "might have been told that," but he had no such recollection. He thought defendant might have had a short attention span. Stauffer was not aware of any problems defendant had that "concerned me so that I really went and did additional work." He agreed with defense counsel's statement that defendant "slipped through the cracks."

On cross-examination, Stauffer testified that he had no information on what the process was in Arizona for finding students emotionally handicapped when defendant attended school there. The prosecutor engaged the witness in the following colloquy: "[Y]ou've had training in clinical psychology and educational psychology, correct?" "Yes." "And are you familiar with this book, which is Hyperactive Children Grown Up?" "I'm aware of it. I haven't—" "Right. It's a classic, or one of the leading books on this field, is that true?" "I think it's an important book in the field." The prosecutor then asked whether it was true that "many, many students" in this country have problems with hyperactivity. Stauffer said, "Yes." The prosecutor asked, "And the vast majority, a high percentage, in the 90's, of those students never go out and commit crimes, do they?" "There's a high percentage. I don't know what percentage." The prosecutor subsequently asked, "[A]re you familiar with the studies which indicate that . . . the percentage of those hyperactives who commit violent crimes is not a whole lot different than any other children who were not hyperactive?" Stauffer replied, "My recollection is that it's not much different."

Defendant did not object below, as he does now, on the ground that the prosecutor was improperly treating Stauffer as an expert. This claim of prosecutorial misconduct is therefore forfeited. (*People v. Gray* (2005) 37 Cal.4th 168, 215 [33 Cal.Rptr.3d 451, 118 P.3d 496].) It is also meritless.

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) Stauffer testified for the defense that he had training in clinical and educational psychology. Defense counsel called Stauffer to support his claim that

defendant was hyperactive and emotionally handicapped, and that Stauffer had failed in his professional capacity to recognize and address these problems. The prosecutor was thus free to explore Stauffer's knowledge of studies demonstrating that even if defendant was a hyperactive child, this did not necessarily mean he would grow up to commit violent crimes. The questioning concerned a subject with which Stauffer was familiar. In the absence of an objection, the prosecution was not required to lay any further foundation regarding Stauffer's qualifications as an expert. (See Evid. Code, § 720, subd. (a).)

Counsel did object that the prosecutor was giving unsworn testimony during his cross-examination of Stauffer. Regarding the book Hyperactive Children Grown Up (Weiss & Hechtman, authors), the prosecutor said, "Take a look at this section on antisocial personality disorders, or antisocial behavior. And, for example, . . . you can read it all if you wish—but the conclusion is that the antisocial behavior—" Defense counsel objected, "Is counsel now testifying? Is he sworn? I'd object to the form of the question." The trial court overruled the objection, stating the prosecutor was allowed to ask leading questions on cross-examination. The prosecutor then said, "In other words, there's—antisocial behavior is much more prevalent in people who have had hyperactivity?" Stauffer answered, "Yes." The prosecutor then asked, "But that antisocial personality disorder is not nearly so prevalent?" Stauffer again responded, "Yes."

Defendant claims the court improperly overruled the objection to this questioning. However, "it is well settled that the scope of cross-examination of an expert witness is especially broad; a prosecutor may bring in facts beyond those introduced on direct examination in order to explore the grounds and reliability of the expert's opinion. [Citations.]" (*People v. Lancaster, supra*, 41 Cal.4th at p. 105.) Here, the prosecutor's questions did not amount to unsworn testimony. They properly presented propositions from a text in Stauffer's field with which he could agree or disagree.

b. *Alleged Improper Argument*

i. *Injection of Personal Beliefs*

Defendant contends the prosecutor improperly injected his personal beliefs, feelings, and experiences into the penalty phase of trial.

During closing argument, the prosecutor said, "Because of the way I was raised I can't find a great deal of sympathy for Mr. Loker. I find it astonishing that when you compare what happened to all of the other members of his family and his religious group he's the only one that went bad." Defendant

objected that the prosecutor was "vouching for his own case" and "injecting his own personal beliefs, feelings and opinions." The trial court overruled the objection, stating, "I think in context it is a discussion of the evidence. . . . [T]he jury is admonished that it would be improper for either counsel to give you their own personal views or opinions or feelings. All counsel can do is discuss with you the evidence and . . . how that relates to the instructions. But counsel are entitled to do that in a variety of ways. And in context I think [the prosecutor] is doing just that." The prosecutor later told the jurors they were free to feel greater sympathy for defendant than he did, and that it was their decision that mattered.[22]

Defendant claims it was improper for the prosecutor to vouch for a death verdict by referring to his own upbringing and biases. A prosecutor may legitimately advance the view that death is the appropriate penalty based on the evidence. (*People v. Sapp* (2003) 31 Cal.4th 240, 310 [2 Cal.Rptr.3d 554, 73 P.3d 433]; *People v. Ghent* (1987) 43 Cal.3d 739, 772 [239 Cal.Rptr. 82, 739 P.2d 1250].) However, defendant is correct that "prosecutors should not purport to rely in jury argument on their outside experience or personal beliefs based on facts not in evidence." (*People v. Medina* (1995) 11 Cal.4th 694, 776 [47 Cal.Rptr.2d 165, 906 P.2d 2].) Here, the prosecutor improperly injected his own experiences and beliefs into the argument. The court should have sustained counsel's objection, but defendant suffered no prejudice. The court did promptly admonish the jury regarding the prosecutor's personal views, and on other occasions reminded it that the arguments of counsel are not evidence. The prosecutor himself emphasized to the jury that its opinion was determinative, not his. Under these circumstances, the error was harmless under any standard.

Defendant also complains about a reference to the prosecutor's wife. After reading the jury instruction that "[t]o return the judgment of death each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead

---

[22] The prosecutor read a portion of CALJIC No. 8.88: " 'Each of you are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider.' That's why I shared with you my own biases. . . . [P]rosecutors are thought of as the guys in the white hats and the ones who represent the community and all that. And all too often those prosecutors don't share with you their own biases. And I'm trying to be as, as fair as possible to Mr. Loker in this case. Just because . . . I may not feel as sympathetic as I should, that doesn't mean you can't just—you may not have had the same kind of life I had. And you may feel much more sympathy towards him than I do. But it's your decision, not mine, that matters. . . . But I find it striking that you are being asked in this case pretty much to say, give me a break because other people were abused. . . . [S]ometimes I get damn tired of hearing about the kinds of things you've heard about in this case. What about all those folks that were abused far worse than Mr. Loker ever was? . . . [I]n Tony Daulton's words, . . . a lot of us suffered far more difficult times than Keith Loker ever did, and he's the only one that went bad. He's the only one that crossed the line."

of life without parole," but that a "judgment of death . . . is never mandated," the prosecutor brought up "something Marcie, my wife, said . . . I said, I'm concerned, honey, because we have heard nothing for the last four or five weeks but defense witnesses who come in and talk about hamburger incidents or whatever. . . . And I'm concerned because there may be what Rush Limbaugh would call a bleeding heart on the jury that wants to save somebody, a rescuer. . . . But she said, David, you have to bring this up and talk about it to the jury. And so that's why I'm bringing it up to you. There may be among you, all of you who are good people, and who because of the types of work you do and the professions you're in, you care about people, you know, you do good work and you care. And I'm concerned that maybe you will become so focused on that, that you care and you want to save people and you want to rescue people, that you're going to forget about what your duty is under this instruction; that you're going to forget about weighing the totality of everything he's done, the pain he's inflicted on not only the victims but their families and so forth. Remember the victims. Who was there to rescue them?"

Defendant did not object to this argument. No exception to this requirement is applicable, and his claim is therefore forfeited. (*People v. Gray, supra,* 37 Cal.4th at p. 215.) In any event, to the extent these remarks were improper, they were clearly not prejudicial. The prosecutor's reference to the conversation with his wife was a passing one, and the jury was appropriately instructed regarding the arguments of counsel.

### ii. *Reliance on Books Not in Evidence*

Defendant asserts the prosecutor committed misconduct by relying on books not in evidence to bolster his argument. The claim is meritless.

During closing argument, the prosecutor said, "There's a wonderful new book out called A Nation of Victims. I don't know if any of you have seen it yet or not. But it bears reading. It has to do with this whole—" The trial court interrupted counsel to note the jury should not read the book during deliberations, and defense counsel objected that the prosecutor was "going beyond the evidence." The court overruled the objection, stating that the prosecutor was "using this for illustration purposes only."

The prosecutor continued, "And in this book this gentleman, and I think there's another book on similar lines by a guy named Alan Dershowitz who was a famous defense lawyer back east, and they talk about the fact that we have become a nation of victims to our own finger-pointing, and that the concept of accountability of action has really changed. In the old days you were accountable for your actions. If you did something wrong you had to

pay for it. But today, over and over with more increasing frequency with all the trials you read about in the newspapers it's always somebody's fault that this happened. And the defendants are always asking for a break because somebody else failed me. I wasn't loved as a child; . . . my parents neglected me; . . . I was at risk and the teachers didn't help me enough. . . . [T]here's a defense we call institutional failure, meaning society or branches of society have failed the defendant. . . . And whatever happened to the notion of accountability. If you cross the line—and he knew where the lines were, folks, remember he just liked doing it—if he crossed the line you're accountable. And that's what the death penalty is all about. It's a matter of saying you've just gone too far."

These references were proper. The wide latitude given to advocates during penalty closing argument generally allows comments drawn from common experience, history, or literature. (*People v. Ward* (2005) 36 Cal.4th 186, 215 [30 Cal.Rptr.3d 464, 114 P.3d 717].) Here the prosecutor did not refer to facts beyond the evidence, but to a viewpoint that was a matter of common experience.

### iii. *Reference to "Portrait of a Serial Killer"*

During closing argument, the prosecutor said, "I think you need to remember some testimony by Hannah, . . . when she said there was this one movie that so bothered her and scared her, that [defendant] kept watching over and over again. And I asked her at first for the name, and she couldn't remember the name. So I said, well, was it about a guy who was a serial killer and rapist and who had been—whose father was a truck driver and . . . once dressed him in a dress to punish him, and ultimately he did all these serial killings and so forth, and then came to San Bernardino to continue? And she still wasn't quite sure about that. Later on I asked her, well, was the movie that scared you the James Bond movie or the Terminator, whatever it was? And she said, no, it was that other one you were talking about. And I said, the Portrait of a Serial Killer? And she says yeah."[23]

Defense counsel objected at sidebar that the name of the movie was not admissible. The court overruled the objection, noting the name of the movie

---

[23] During her testimony, Hannah acknowledged that there was a time when defendant had become obsessed with violent movies, one in particular. The prosecutor asked if that was Portrait of a Serial Killer. Hannah said she did not remember the title, though she had watched it. The prosecutor asked if she remembered it being "about a man who raped and killed women and whose father was a truck driver and whose father made him wear a dress once as a child and who ultimately decided to come to San Bernardino to kill more." Hannah replied that she did not remember the details. However, later in the cross-examination Hannah affirmed that the movie described by the prosecutor was the one in question, saying, "That was the one[] you just talked to me about a few minutes ago." The prosecutor inquired, "The Portrait of a Serial Killer?" Hannah said, "I don't know the name of it, but that's the incident."

was discussed during Hannah's testimony, and that "certainly counsel can refer to the actual testimony." It then admonished the jury: "The jury is, of course, again reminded that the statements of the attorneys are not evidence. And if there's any question about what the actual evidence or testimony was you can consult your own memories or notes or, if necessary, have the reporter read back the transcript of the proceedings if there's any question as to any actual testimony."

Defendant contends the prosecutor's argument regarding the motion picture was inflammatory and prejudicial because it relied not on evidence, but on the prosecutor's questions. He claims the prosecutor "effectively invited the jury to compare [defendant's] life to this movie and invoked a terrifying image of a serial killer preying upon the very community where the trial took place." Defendant did not make this claim below. Again, no exception is applicable; it is therefore forfeited. (*People v. Gray, supra,* 37 Cal.4th at p. 215.)

The argument is also meritless, for the most part. Defendant is correct that Hannah did not recall the name of the movie, so the title itself was not in evidence. Defense counsel's objection on this point was well taken; however, the court promptly admonished the jury that the statements of counsel were not evidence and referred it to the actual testimony of the witness. Furthermore, the circumstance that the prosecutor provided the title of the movie had limited impact, given that Hannah did recognize the plot of the movie as the one that had frightened her. The prosecutor mentioned the plot in the context of arguing that defendant "wanted to be the baddest of the bad. . . . [H]e chose this lifestyle." Description of a violent movie plot with which defendant was fascinated was appropriate in this circumstance. Moreover, contrary to defendant's contention, nothing in the prosecutor's description of the film "made the jury believe the prosecutor had information that was not available to them." Considering the argument as a whole, the reference to Portrait of a Serial Killer was not in itself prejudicial. Furthermore, given the evidence of the crimes committed by defendant, it is inconceivable that the jury was swayed to vote for death because it learned he had repeatedly watched this movie.

### 7. *Alleged Instructional Error*[24]

#### a. *Proposed Mitigation Instructions*

Defendant challenges the court's refusal to instruct the jury that mitigating factors are not required to be proven beyond a reasonable doubt.[25] However, we have held that "[t]he jury need not be instructed that it does not have to find mitigating factors unanimously or beyond a reasonable doubt." (*People v. Zambrano, supra,* 41 Cal.4th at p. 1186.) Defendant's arguments on this point are based on the decisions in *Apprendi v. New Jersey, supra,* 530 U.S. 466, and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]. We have repeatedly explained that these precedents do not apply to California's capital sentencing scheme. (E.g., *People v. Abilez* (2007) 41 Cal.4th 472, 535 [61 Cal.Rptr.3d 526, 161 P.3d 58]; *People v. Prieto* (2003) 30 Cal.4th 226, 262–263, 272 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)

Defendant also contends the court improperly rejected his proposed instruction that "unlike the guilt phase of this trial, feelings of compassion, mercy, sympathy or pity for the defendant and his family are appropriate and such feelings may alone support a sentence of life in prison without the possibility of parole." The court modified this instruction to state, "Unlike the guilt phase of this trial, feelings of compassion, mercy, sympathy or pity for the defendant and his family may be considered by you in determining the appropriate penalty." The jury was also informed that "a judgment of death . . . is never mandated. A juror may always exercise his or her discretion to select the penalty of life without the possibility of parole instead of the penalty of death."

Defendant claims he was entitled to an instruction that sympathy or compassion *alone* could justify rejection of the death penalty. We have never held that such an instruction is required. (See *People v. Hinton* (2006) 37 Cal.4th 839, 911–912 [38 Cal.Rptr.3d 149, 126 P.3d 981]; *People v. Taylor* (1990) 52 Cal.3d 719, 745–746 [276 Cal.Rptr. 391, 801 P.2d 1142].) Here, in

---

[24] As to all claims of instructional error, defendant asserts violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. As to the claims regarding defendant's proposed instructions, he also asserts violation of California Constitution, article I, sections 7 and 15.

[25] The proposed instruction stated: "Your duty in this phase of the case is different from your duty in the guilt phase of the trial, where you were required to determine whether or not the defendant was guilty of the crimes, the special allegations, and the special circumstances charged beyond a reasonable doubt. Your responsibility in the penalty phase is to render an individualized, moral determination whether the defendant should be sentenced to prison without the possibility of parole, or to die by execution. You may find that a mitigating circumstance exists if there is any proof at all to support it, since a mitigating circumstance is not required to be proven beyond a reasonable doubt."

addition to the instructions quoted above, the jury was told that "the weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale" and that "you are free to assign whatever moral or sympathetic value you determine appropriate to each and all of the various factors." The instructions as a whole accurately informed the jury of the role that sympathy and compassion could play in its deliberations.

### b. *The Other Crimes Instruction*

The court gave a version of CALJIC No. 8.87 that listed the other crimes committed by defendant and then stated, "each of which involved the express or implied use of force or violence or the threat of force or violence." Defendant contends the instruction improperly directed the jury to find that the other crimes involved force or violence. We have held, however, that the characterization of other crimes as involving express or implied use of force or violence, or the threat thereof, is a legal question properly decided by the court. (*People v. Monterroso* (2004) 34 Cal.4th 743, 793 [22 Cal.Rptr.3d 1, 101 P.3d 956]; *Nakahara, supra*, 30 Cal.4th at p. 720.)

### c. *Failure to Reinstruct on Reasonable Doubt*

Defendant correctly argues that the court should have instructed the jury on the definition of reasonable doubt at the penalty phase. Although the jury was so instructed at the guilt phase, defendant notes that the penalty phase instructions required it to "disregard all other instructions given to you in the guilt phase of this trial." The jury was also told that "[b]efore a juror may consider any [delineated] criminal acts or activity as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant, . . . did in fact commit such criminal acts or activity." Defendant contends the "jury was told to disregard the only instruction that would have provided guidance for them to determine what constituted proof beyond a reasonable doubt."

We have previously encountered this precise claim. As in *People v. Chatman* (2006) 38 Cal.4th 344, 407–408 [42 Cal.Rptr.3d 621, 133 P.3d 534], while the court should have reinstructed the jury as to the definition of reasonable doubt at the penalty phase, its failure to do so was harmless. "Absent any suggestion to the contrary, the jury would likely have assumed the reasonable doubt the court referred to at the penalty phase had the same meaning as the term had during the guilt phase. There is no reasonable likelihood [citation] the jury would have believed the reasonable doubt analysis it was required to engage in at the penalty phase was somehow different than the reasonable doubt analysis it had already engaged in at the

guilt phase. That the court would not have changed the meaning of such an important term without saying so is a 'commonsense understanding of the instructions in the light of all that has taken place at the trial [that is] likely to prevail over technical hairsplitting.' (*Boyde v. California* (1990) 494 U.S. 370, 381 [108 L.Ed.2d 316, 110 S.Ct. 1190].) Additionally, 'the jury did not request a further explanation of the reasonable doubt standard, as it surely would have done had it been confused as to the meaning of reasonable doubt.' ([*People v.*] *Holt* [(1997) 15 Cal.4th 619,] 685 [63 Cal.Rptr.2d 782, 937 P.2d 213].)" (*Chatman*, at p. 408.)

We note that in this case the reasonable doubt instruction was required only for one of the criminal incidents introduced as aggravating evidence, i.e., the Kim robbery. Defendant was convicted of the other crimes, and as to those the instruction was superfluous. (*People v. Hinton, supra*, 37 Cal.4th at p. 910.)

### 8. *Alleged Juror Misconduct*

Defendant asserts numerous incidents of juror misconduct during the penalty phase deliberations.[26] In the trial court, the defense submitted declarations from Jurors C.B., C.L., S.B., D.B., S.Y., L.M., J.G., and G.C., in connection with a new trial motion based partly on claims of juror misconduct. The prosecution responded with a set of "amended declarations" from the same jurors. In her amended declaration, Juror C.L. said she felt "deceived that the defense investigator asked me to sign my declaration 'just to close out our files.'" Likewise, Juror G.C. stated he had asked the investigator "why I was being asked to sign the declaration and she said it was just to close out their file, to show that they had interviewed me, and that they would never see me again. Had I known that it was for a motion for a new trial I would have reviewed it more carefully and asked to see her notes of my interview to check it for accuracy."

Defendant did not file a response to the amended declarations. The parties agreed that there was no need to take live testimony from the jurors, and that the court could decide the motion based on the declarations. (See *People v. Hedgecock* (1990) 51 Cal.3d 395, 415 [272 Cal.Rptr. 803, 795 P.2d 1260].) After hearing argument, the trial court denied defendant a new trial.

In reviewing defendants' claims, we follow the guidelines stated in *People v. Danks* (2004) 32 Cal.4th 269 [8 Cal.Rptr.3d 767, 82 P.3d 1249]: "'Misconduct by a juror . . . usually raises a rebuttable "presumption" of

---

[26] He claims his rights were violated under the Fifth, Sixth, Eighth, and Fourteenth Amendments, and California Constitution, article I, sections 7 and 15.

prejudice. . . .' [Citation.] However, '[t]he introduction of much of what might strictly be labeled "extraneous . . ." cannot be deemed misconduct. The jury system is an institution that is legally fundamental but also fundamentally human. Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience. That they do so is one of the strengths of the jury system. It is also one of its weaknesses; it has the potential to undermine determinations that should be made exclusively on the evidence introduced by the parties and the instructions given by the court. Such a weakness, however, must be tolerated. "[I]t is an impossible standard to require . . . [the jury] to be a laboratory, completely sterilized and freed from any external factors." ' " (*Id.* at p. 302.) " 'The safeguards of juror impartiality . . . are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.' (*Smith v. Phillips* (1982) 455 U.S. 209, 217 [71 L.Ed.2d 78, 102 S.Ct. 940].)" (*Danks*, at p. 303.)

"If we conclude there was misconduct, we then consider whether the misconduct was prejudicial." (*People v. Danks, supra*, 32 Cal.4th at p. 303.) The verdict will only be set aside if there appears to be a substantial likelihood of juror bias. (*Ibid.*) Such bias can be inherent or circumstantial. As to inherent bias, we consider whether the " 'extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror.' " (*Ibid.*, quoting *In re Carpenter* (1995) 9 Cal.4th 634, 653 [38 Cal.Rptr.2d 665, 889 P.2d 985].) We review "the trial record to determine the prejudicial effect of the extraneous information." (*Carpenter*, at p. 653.) "[E]ven if the extraneous information was not so prejudicial, in and of itself, as to cause 'inherent' bias under the first test, the totality of the circumstances surrounding the misconduct must still be examined to determine objectively whether a substantial likelihood of actual bias nonetheless arose." (*Id.* at p. 654.) Under this test, "[a]ll pertinent portions of the entire record, including the trial record, must be considered." (*Ibid.*; see also *Danks*, at p. 303.) Whether prejudice arose from juror misconduct is a mixed question of law and fact. We review legal issues independently, and accept the trial court's factual findings if they are supported by substantial evidence. (*Danks*, at pp. 303–304.)

Defendant contends the California standard for determining prejudice resulting from juror misconduct is inconsistent with federal law. However, we have consistently adhered to the "substantial likelihood" standard set forth above. (E.g., *People v. Leonard* (2007) 40 Cal.4th 1370, 1425 [58 Cal.Rptr.3d 368, 157 P.3d 973]; *People v. Williams, supra*, 40 Cal.4th at p. 336.) Defendant provides neither controlling authority nor persuasive argument that we should alter this settled approach. In any event, as the discussion below establishes, there is no "reasonable possibility" (the standard defendant

invokes) that defendant was prejudiced by juror misconduct, whether his claims are considered individually or cumulatively.

### a. Comment on Defendant's Failure to Testify

In the original declarations, several jurors stated that during penalty deliberations there was discussion of defendant's failure to testify. Juror S.Y. said there "was a consideration of remorse involving the fact that the Defendant did not testify." Juror J.G. said, "[t]he fact that he did not take the stand was discussed as weighing heavily against him." Juror L.M. said the jurors discussed defendant's lack of remorse.

In her amended declaration, Juror D.B., who was the foreperson, stated, "Whenever improper things were brought up, I reminded the jury of the Judge's instructions that we could not consider them, and had to restrict our deliberations to the actual evidence submitted and the instructions of law. After that there was no further discussion about the particular area. [¶] Someone brought up the defendant not testifying. I reminded them that he had a legal right not to testify and it should not be held for or against him; that it should not be considered one way or the other. That was the end of it. [¶] We did discuss at length whether or not he had shown remorse, but this was based on the tape recorded interviews of him that we had and his demeanor in court. It was not discussed relating to his not testifying." The amended declarations of Jurors S.Y., J.G., L.M., C.L., C.B., S.B., and G.C. were consistent with D.B.'s amended declaration.[27]

---

[27] Juror S.Y. stated that "While some of us were curious as to why the defendant did not testify, we did not consider that fact in our actual deliberations. . . . We did discuss whether he had shown remorse through other witness testimony, in his courtroom behavior or in his tape-recorded interviews which we were given as evidence, but our consideration of remorse had nothing to do with his failure to testify." Juror J.G. stated, "That the Defendant did not testify was mentioned, but not discussed . . . . [¶] We did consider whether the defendant had shown any remorse, but only from the taped interviews in evidence and his demeanor in court, not because he did not testify." Juror L.M. stated, "That Loker did not testify was mentioned only briefly . . . . This is the only time the matter was even brought up. [¶] We did talk about Loker's lack of remorse from the video tapes of his confessions. It had nothing to do with his not testifying . . . ."

Juror C.L. stated, "I think it was me who brought up the fact that Loker did not testify. I said the defense did not give us much, only family. I said if he had testified it would have given us more to base our decision on . . . . [¶] There was discussion about the defendant not acting in court like the defense was representing him to be." Juror C.B. stated, "Someone did mention the fact that Mr. Loker did not testify, but someone else said 'That has nothing to do with our deliberations' and the topic was no longer discussed." Juror S.B. stated, "The fact that Mr. Loker did not testify was commented on, but [was] not an issue. It was only mentioned, not considered in our deliberations." Juror G.C. stated, "Every juror pro[ba]bly wonders about things like the defendant not testifying, costs of trial, etc., and some of us did that in this case, but I made it very clear and specifically told [the defense investigator] a number of times that

The trial court found that the jurors committed misconduct by mentioning defendant's failure to testify, but concluded there was no prejudice because the discussions were brief, the foreperson admonished the jury, and thereafter the subject was dropped. Clearly, the court accepted the version of the discussions presented in the amended declarations. We will not disturb that credibility determination, which is supported by substantial evidence. (*People v. Leonard, supra*, 40 Cal.4th at p. 1423.)

 "[B]y violating the trial court's instruction not to discuss defendant's failure to testify, the jury committed misconduct. [Citations.] This misconduct gives rise to a presumption of prejudice, which 'may be rebutted . . . by a reviewing court's determination, upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual harm.' [Citations.]" (*People v. Leonard, supra*, 40 Cal.4th at p. 1425.) We independently review the trial court's determination that defendant was not prejudiced by the improper comments. (*Ibid.*) Here, we uphold the court's ruling. It is natural for jurors to wonder about a defendant's absence from the witness stand. (*Ibid.*) The amended declarations show that the comments on this subject were brief and played no role in the jury's penalty deliberations. "[T]he purpose of the rule prohibiting jury discussion of a defendant's failure to testify is to prevent the jury from drawing adverse inferences against the defendant, in violation of the constitutional right not to incriminate oneself." (*Ibid.*) Even if some comments disclosed in the amended declarations might have given rise to inferences adverse to defendant, the foreperson promptly forestalled that possibility, reminding the jurors that defendant had a right not to testify and that his assertion of that right could not be held against him. Under these circumstances, the purpose of the rule against commenting on defendant's failure to testify was served, and the presumption of prejudice is rebutted.

### b. *Discussion of Costs Associated with Punishment*

Several of the original declarations stated that during their deliberations, the jurors discussed the cost of life imprisonment without the possibility of parole versus the death penalty.

In her amended declaration, Foreperson D.B. stated, "The cost of life in prison [versus] the death penalty was brought up and again I reminded the jury that this topic was legally irrelevant and couldn't be considered. I

---

the things in my declaration were only briefly mentioned, and not part of our deliberations. None of these things were discussed at any length . . . ."

reminded them of the jury instruction about this." The amended declarations of Jurors S.Y., C.B., L.M., J.G., and G.C. were in accord.[28]

The court found that it was improper for the jurors to discuss the costs of punishment, but deemed the misconduct not prejudicial because the discussion was brief and was met with an admonition from the foreperson. These factors, amply supported in the amended declarations, support the court's ruling.

### c. *Speculation on the Gaughan Report*

In the original declarations, several jurors stated that there was some discussion of what other information might be in the Gaughan psychiatric report prepared in connection with defendant's Arizona crimes. (See pt. II.B.1., *ante.*)

In her amended declaration, the foreperson stated, "There was some curiosity about the Arizona psychiatric report, but I reminded the jury that we had to consider only what was before us and could not speculate about what was not." Her amended declaration is consistent with those of the other jurors.[29]

The court ruled that the jury's expressions of interest in the report did not rise to the level of misconduct, and even if they did the matter "was only a

---

[28] Juror S.Y. stated, "Maybe someone mentioned the cost of life without parole versus that of the death penalty, but it was not discussed in our deliberations." Juror C.B. stated, "The cost of life without parole was mentioned . . . . It was an offhand comment and not part of our deliberations." Juror L.M. stated, "The cost of life in prison without parole was mentioned but not discussed. The judge admonished us that we couldn't discuss it. The cost of bringing witnesses was mentioned but not in deliberations." Juror J.G. stated, "The cost of life imprisonment was mentioned but not discussed."

[29] Juror S.Y. stated, "Some of us were curious about the contents of the Arizona psychiatric report which we were not allowed to hear, but we did not speculate about it or consider the missing portions in our deliberations." Juror L.M. stated, "There was some mild curiosity from some jurors about what else was in the Arizona psychiatric report, but we had to limit our discussions to courtroom evidence only." Juror C.L. stated, "We had no idea what else was in the Arizona report. I don't remember any discussion of it, only that we wished we knew all of it to help make our decision." Juror C.B. stated, "We did not speculate about what else was in the Arizona psychiatric report, although we were curious about what was in there. The missing portion was not part of our deliberations." Juror J.G. stated that after the jury wrote a note to the trial judge asking to see the Arizona psychiatric report, but were refused, "it was over. We did not discuss it further."

The note to which Juror J.G. referred does not appear in the record. Although the trial court also referred to such a note in discussing the declarations, the only note from the jury pertaining to the Gaughan report that appears in the record is one sent during the penalty phase asking when defendant's interview with Gaughan occurred. In any event, it is clear that each time jurors expressed curiosity about the undisclosed contents of the report, they were reminded not to allow speculation to enter into their decision.

passing question which was answered with a strong admonition by the court [when the report came up during trial] and followed up with the re-admonition by the foreperson of the jury." The court's ruling was proper. The declarations do not show that speculation about the Gaughan report played a role in the deliberations, and any possibility that it did was mitigated by the foreperson's reminder.

### d. Consideration of Professional Expertise

In her original declaration, Juror S.B. said, "Based upon my professional experience, I explained to the other jurors that the Defendant's family was not seriously dysfunctional. I related to the jury members that based upon my professional experience (who I explained 'whored' their own children for profit) the Defendant was not raised in such a dysfunctional family."[30] In her amended declaration, S.B. disavowed much of the initial declaration: "The words 'seriously dysfunctional' were not used by me or anyone else. Also, I cannot imagine myself saying that 'the Defendant was not raised in such a dysfunctional family.' I did not voice or claim any 'professional experience.' I have none. I am a student only. I did mention that I knew of a kid who was whored out as a toddler, but who came out all right; he now works as a janitor in Loma Linda."

Juror J.G.'s original declaration read in part: "As a teacher with experience in Special Education I explained to the other jurors that it was my profes-sional opinion that Defendant . . . was not seriously learning handicapped. I gave the other jurors examples from my professional background to prove that Defendant Loker was not seriously learning disabled. Additionally, I explained from my professional background that the Defendant was not so dysfunctional as to be excusable." In his amended declaration, J.G. stated, "I did say to other jurors that the defendant did not appear to me to be handicapped as a slow learner, but I did not express my beliefs as an expert. I never used the term 'professional expertise' or anything like that, and did not try to convey any 'professional' background to other jurors."

In his original declaration, Juror G.C. stated that "jurors discussed their professional experience regarding special education, learning disabilities, and dysfunctional families to show that the defendant was not seriously learning disabled, and that his family was not seriously dysfunctional." In his amended declaration, Juror G.C. said, "I made it very clear and specifically told [the defense investigator] a number of times that the things in my declaration were only briefly mentioned, and not part of our deliberations. None of these things were discussed at any length . . . ."

---

[30] Juror S.B. crossed out several words of the declaration, which is why it appears disjointed.

In her amended declaration, Juror D.B. stated, "No one mentioned having any professional or expert experience. Our discussions were based on personal experience and opinions only." The amended declarations of Jurors S.Y., L.M., C.L., and C.B. were consistent with D.B.'s amended declaration.[31] In addition, Juror L.M., echoed by Juror C.B., stated, "None of us felt Loker was handicapped or abused. This was from the evidence in court."

At a hearing regarding the declarations, the court observed that the "one area that there does appear to be some dispute in the declarations is whether or not jurors expressed their own professional experience, training, or education, or offered their own experience as a basis for evaluating any of the issues or evidence that was presented. Some of the declarations supplied by the defense indicates that some of the jurors did do that. The declarations filed by the prosecution indicate that there was no such discussion." Defense counsel replied, "I'm satisfied with the state of the court's factfinding in terms of the issues discussed." Counsel affirmed that there was no need for the jurors to be called to testify at an evidentiary hearing, and that the court could decide the issue based on the declarations.

At the subsequent new trial hearing, defense counsel noted that the "court had originally indicated that it was in dispute as to whether jurors used their professional experience and training and education in terms of guiding the jury . . . in the deliberations." He argued that Juror G.C.'s declaration provided a "third somewhat independent person on that issue who may guide the court in that regard."

The trial court found that while Juror G.C. heard "something that he at least took as a reference to . . . something that he might have perceived as an area of expertise of a juror, . . . clearly the weight from all of the affidavits indicates that if there was any such discussion it was not an ongoing discussion. And, indeed, most of the jurors were not even aware of it and don't recall even hearing it. So there's nothing to suggest that it was a topic of conversation or deliberations, if there was any such mention. And from the affidavits I can't even find that there was such mention. But if there was it was clearly something that was very brief and was . . . not even to the point

---

[31] Juror S.Y. stated, "No jurors discussed dysfunctional families or abuse as though they were an expert or had professional experience in these areas. Only our everyday life experiences were discussed as we evaluated those issues." Juror L.M. stated, "No jurors expressed opinions as if they were professionals or experts. . . . Specifically, I don't remember anyone, including jurors [S.B.] or [J.G.], ever doing that." Juror C.L. stated, "I don't recall anyone expressing their opinions as professionals or expert[s]. I knew juror [S.B.] worked in Social Services, but she didn't say she was an expert or had professional expertise." Juror C.B. stated, "Nobody claimed to be a professional or expert about anything, or brought in a professional or expert opinion. Our discussion of whether or not Mr. Loker had been abused, etc., was all based on facts in the courtroom."

where the other jurors even heard it. So there's nothing there to suggest that there indeed was improper expert opinion or other improper evidence brought into the jury room that was used by any juror to evaluate the evidence." The court also found that there was no prejudice from any juror exposure to this subject.

 Even assuming the jurors made the statements attributed to them in the original declarations, we conclude there was no misconduct. "[J]urors may rely on their own experiences in evaluating the testimony of the witnesses. 'Jurors do not enter deliberations with their personal histories erased, in essence retaining only the experience of the trial itself. Jurors are expected to be fully functioning human beings, bringing diverse backgrounds and experiences to the matter before them.' " (*People v. Leonard, supra,* 40 Cal.4th at p. 1414.)

"The views the jurors allegedly asserted here were not contrary to, but came within the range of, permissible interpretations of th[e] evidence. All the jurors, including those with relevant personal backgrounds, were entitled to consider this evidence and express opinions regarding it. . . . A juror may not express opinions based on asserted personal expertise that is different from or contrary to the law as the trial court stated it or to the evidence, but if we allow jurors with specialized knowledge to sit on a jury, and we do, we must allow those jurors to use their experience in evaluating and interpreting that evidence. Moreover, during the give and take of deliberations, it is virtually impossible to divorce completely one's background from one's analysis of the evidence. We cannot demand that jurors, especially lay jurors not versed in the subtle distinctions that attorneys draw, never refer to their background during deliberations." (*People v. Steele* (2002) 27 Cal.4th 1230, 1266 [120 Cal.Rptr.2d 432, 47 P.3d 225]; accord, *People v. San Nicolas* (2004) 34 Cal.4th 614, 650 [21 Cal.Rptr.3d 612, 101 P.3d 509].)

"A fine line exists between using one's background in analyzing the evidence, which is appropriate, even inevitable, and injecting 'an opinion explicitly based on specialized information obtained from outside sources,' which we have described as misconduct." (*People v. Steele, supra,* 27 Cal.4th at p. 1266.) The declarations in this case do not show that the jurors crossed the line into misconduct. Whether defendant's family was dysfunctional or whether he had a learning disability are not areas foreign to the experience of most jurors.

e. *Discussions Outside the Jury Room*

Defendant contends the amended declarations of Jurors L.M. and G.C. disclosed improper discussions outside the deliberations. Juror L.M.'s declaration stated, "The cost of bringing witnesses was mentioned but not in

deliberations. I couldn't believe [defense counsel] Katz was bringing in all these witnesses from out of state to say the same thing repeatedly." Defendant evidently relies on Juror G.C.'s passing reference to "the things in my [original] declaration [that] were only briefly mentioned, and not part of our deliberations."

The trial court made no specific finding on this claim, but it is plainly meritless. Defendant's argument is not directed at the substance of any discussions. He asserts that because they took place outside the collective deliberative process, they violated the court's instruction not to discuss the case individually and were beyond the reach of curative instruction or admonition. However, the declarations do not reflect discussions outside the jury room. Neither L.M. nor G.C. indicates where the matters in question were mentioned. The amended declarations of these two jurors explain statements made in their original declarations, and the original declarations pertained to discussions during the penalty deliberations. Thus, defendant's claim that the jurors engaged in improper discussions outside the deliberations of the full jury finds no support in the record.

### f. Conversation Between Juror C.B. and Mr. Paul

Juror C.B.'s original declaration related the following conversation: "During a break [in] the presentation of evidence I was in the hall outside of the courtroom when Mr. Paul, the deceased victim's father, engaged me in convers[at]ion. At that time I did not know his status in the trial but I thought he was somehow part of the proceedings. I became aware of who Mr. Paul was at a later point in the trial, before deliberations. [¶] Mr. Paul and I discussed the fact that we were both U.S. Marine Corps veterans. Additionally, Mr. Paul told me about his planned prostate surgery." In his amended declaration, C.B. confirmed the accuracy of his previous declaration, but stated that "[n]othing about that conversation with him was mentioned in deliberations and had anything to do with my verdict."

The court found that it was misconduct for Juror C.B. to have a hallway conversation with someone he knew to be part of the proceedings, but concluded that no prejudice resulted given the "content of the discussion, the manner in which it occurred," and its brevity. We agree the incident was harmless. "Of course it was misconduct for the jurors to communicate with anyone associated with the case. (See § 1122.)" (*People v. Jones* (1998) 17 Cal.4th 279, 310 [70 Cal.Rptr.2d 793, 949 P.2d 890]; see also *People v. Stewart* (2004) 33 Cal.4th 425, 510 [15 Cal.Rptr.3d 656, 93 P.3d 271].) This conversation, however, could not have been prejudicial. The two men discussed the fact that they had both been Marines, and Mr. Paul's impending surgery. Such a conversation is not, judged objectively, "inherently and

substantially likely to have influenced the juror." (*In re Carpenter, supra*, 9 Cal.4th at p. 653.) Nor does it objectively demonstrate a substantial likelihood, or even a reasonable possibility, of actual bias. (*People v. Danks, supra*, 32 Cal.4th at p. 303; see *Stewart*, at pp. 509–510 [juror's compliment to defendant's former girlfriend did not concern the merits of the case and was misconduct of a trifling nature]; *People v. Phelan* (1899) 123 Cal. 551, 567 [56 P. 424] [juror's conversation with a victim's brother on a subject unrelated to the case was not misconduct].)

### 9. Constitutionality of the Death Penalty Statute

Defendant makes numerous claims that California's death penalty statute violates the United States Constitution. None has merit.

Section 190.2 is not impermissibly broad in violation of the Eighth Amendment. The multiple-murder special circumstance adequately narrows the class of murderers subject to the death penalty. (*People v. Stevens* (2007) 41 Cal.4th 182, 211 [59 Cal.Rptr.3d 196, 158 P.3d 763].)

Section 190.3, factor (a), which allows the jury to consider "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1," does not violate the Fifth, Sixth, Eighth, or Fourteenth Amendment to the United States Constitution by allowing arbitrary imposition of the death penalty. (*Tuilaepa v. California* (1994) 512 U.S. 967, 975–976 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People v. Stevens, supra*, 41 Cal.4th at p. 211.)

The death penalty statute does not violate the Eighth and Fourteenth Amendments by failing to require the state to prove beyond a reasonable doubt that aggravating factors are true (except for other unadjudicated crimes), that aggravating factors outweigh mitigating factors, or that death is the appropriate sentence. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1059 [63 Cal.Rptr.3d 82, 162 P.3d 596].) Nor does the lack of a unanimity requirement as to which aggravating evidence is true violate the Sixth, Eighth, or Fourteenth Amendment. (*People v. Stevens, supra*, 41 Cal.4th at p. 212.) The failure to require written or other specific findings by the jury does not violate federal due process or Eighth Amendment rights to meaningful review. (*Stevens*, at p. 212.) Nothing in *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856], *Apprendi v. New Jersey, supra*, 530 U.S. 466, or *Ring v. Arizona, supra*, 536 U.S. 584, affects our conclusions in these regards. (*Barnwell*, at pp. 1058–1059; *Stevens*, at p. 212.)

The failure to require intercase proportionality does not violate due process or the Eighth Amendment. (*Pulley v. Harris* (1984) 465 U.S. 37, 50–51

[79 L.Ed.2d 29, 104 S.Ct. 871]; *People v. Barnwell, supra,* 41 Cal.4th at p. 1059.) Contrary to defendant's claim, the use of unadjudicated criminal activity during the penalty phase is permissible, and does not violate the Fifth, Sixth, Eighth, and Fourteenth Amendments. (*People v. Stevens, supra,* 41 Cal.4th at p. 212; *People v. Box, supra,* 23 Cal.4th at p. 1217.)

The death penalty statute does not violate defendant's right to equal protection or the heightened reliability requirement of the Eighth Amendment. "[C]apital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws or due process of law . . . ." (*People v. Manriquez* (2005) 37 Cal.4th 547, 590 [36 Cal.Rptr.3d 340, 123 P.3d 614].)

We again reject the argument that the death penalty statute is contrary to international norms of humanity and decency, and therefore violates the Eighth and Fourteenth Amendments. Defendant points to no authority that "prohibit[s] a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754].)

### 10. *Proportionality*

Defendant contends the death verdict is disproportionate to his personal culpability, and asks this court to reduce the sentence to life imprisonment with the possibility of parole. He claims that his immaturity, emotional problems, lack of prior criminal behavior, dysfunctional family background, drinking at the time of the murders, and subsequent remorse make the death penalty inappropriate.

The jury considered these factors, and we decline to overturn its penalty determination. Defendant embarked on a brutal and terrifying crime spree that spanned a period of days. He first robbed an individual of his car at gunpoint. Hours later, he entered a store and shot all four people inside, killing two of them. He stole the wallets of two victims, and forced another, who had a bullet in her head, to give him money from the cash register. Soon after fleeing to Arizona, he committed attempted murder, robbery, kidnapping, and rape. Before his capture, he led law enforcement on a lengthy high-speed chase, and in so doing assaulted five officers. Given this course of criminal conduct, "the death sentence is certainly not so disproportionate that it shocks the conscience [or] offends fundamental notions of human dignity." (*People v. Livaditis* (1992) 2 Cal.4th 759, 786 [9 Cal.Rptr.2d 72, 831 P.2d 297].)

### 11. *Cumulative Error*

Defendant claims that cumulative error at both the guilt and penalty phase requires reversal. We have rejected nearly all defendant's assignments of

error, and when we have found or assumed error, we have concluded defendant was not prejudiced. Defendant "has merely shown that his ' "trial was not perfect—few are." ' " (*People v. Cooper* (1991) 53 Cal.3d 771, 839 [281 Cal.Rptr. 90, 809 P.2d 865].)

### III. DISPOSITION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied October 1, 2008. Kennard, J., did not participate therein.